LEWIS WHITE, et al., Respondents, *v.* CHAUNCEY MILLER, et al., Appellants.

Under the provision of the "act in relation to certain trusts" (chapter 174, Laws of 1839, as amended by chapter 373, Laws of 1849), declaring the validity of deeds executed prior to January 1, 1830, to any persons in trust for any "united society of people called Shakers," and that the legal authority vested in the original trustees shall "forever descend in regular succession to their successors in office," and which also authorizes future trusts for the benefit of any such society, the trustees of a society of Shakers, so holding its property in trust, are to be regarded as a corporate body, and the property held by them as corporate property for the purposes of the remedy by suit to enforce any authorized contract made by them in the business of and for the society.

An action upon such a contract, therefore, may be brought against the society designating the defendant as "trustees of the mutual society called Shakers," and a judgment in the action when docketed will become a lien on the real estate held by the trustees, and may be collected out of the real and personal estate in their hands, as in case of a judgment against individuals.

Where a dealer sells an article describing it by the name of an article of commerce, the identity of which is not known to the purchaser, this constitutes a warranty that the article sold is that described.

*Seixas* v. *Wood* (2 Caines, 48); *Swett* v. *Colgate* (20 J. R., 196) overruled.

Where the trustees of a society of Shakers have authority under their covenant to make contracts of sale, they have, as incident thereto, the power to give the article sold a name and descriptive character, and so to bind the society upon a warranty arising from such a description.

Upon the sale of seeds by the grower, a warranty is implied that they are free from any latent defect arising from improper cultivation.

Gains prevented, as well as losses sustained, may be recovered as damages for a breach of contract where they can be rendered reasonably certain by evidence, and have naturally resulted from the breach.

The rule that the declarations of an agent are inadmissible to bind his principal, unless they constitute an agreement the agent is authorized to make, or relate to and accompany an act done in the course of the agency, is applicable in all cases, whether the agent is general or special, or the principal a corporation or a private person.

Plaintiffs, who were market gardeners, in 1867 purchased of defendants, who were growers of seed for the market cabbage seed of a variety known as "Large Bristol Cabbage," which produced cabbage of that variety. In the fall of that year plaintiff was advised by M., one of defendants' trustees, that they had raised a quantity of the same kind of seed and solicited plaintiffs to purchase. Plaintiffs went to defend-

ants' store to purchase seed, and were shown a catalogue. Among others on the list was "Large Bristol Cabbage," of which plaintiffs ordered a quantity. The required quantity of seed was sent them. In the accompanying bill of parcels, the seed was described as in the catalogue. The seed in question was raised on Bristol cabbage stocks, which were planted in the vicinity of stocks of other varieties, and in consequence of the crossing of the varieties, the seed in question became impure and not genuine Bristol cabbage seed, and the plants raised therefrom were worthless. In an action to recover damages, *held,* that the sale was with warranty that the seed sold was Bristol cabbage seed; also, that there was an implied warranty that such seed was free from any latent defect arising from the mode of cultivation; that, whether the seed was Bristol cabbage within the warranty depended upon the fact whether it would produce, under proper cultivation, Bristol cabbage, not upon the origin of the stocks upon which it grew; but if this were not so, there was still a breach of the implied warranty.

Also, *held,* that the fact that M. was named in the bill of parcels as the vendor, did not preclude plaintiffs from treating the transaction as a sale by defendants.

Also, *held,* that the proper measure of damages was the difference in value between the crop raised from the defective seed and a crop of Bristol cabbage, such as would ordinarily have been produced that year.

The referee allowed interest on the damages from the time the crop would have been harvested and sold. *Held,* error.

Declarations of M., made eight months after the sale, and not connected with any business then being transacted, to the effect that the seed was defective and not genuine Bristol cabbage seed, because of improper cultivation, were admitted in evidence. *Held,* error; that they were the declarations of an agent when not engaged in the business of his agency.

*White* v. *Miller* (7 Hun, 427) reversed.

(Argued September 19, 1877; decided November 13, 1877.)

APPEAL from judgment of the General Term of the Supreme Court, in the third judicial department, affirming a judgment in favor of plaintiffs, entered upon the report of a referee.

This action was brought against defendants as "trustees of the mutual society called Shakers," located in the town of Watervliet, Albany county, to recover damages alleged to have been sustained by reason of a breach of warranty made upon sale of a quantity of cabbage seed.

The facts appear sufficiently in the opinion.

*Lyman Tremain,* for appellants. The judgment against the trustees, as such, was wholly unwarranted, and cannot be maintained. (*Duvall* v. *Craig,* 4 Wheat., 20.) The society, of which defendants are trustees, is not a corporation, and it cannot be sued as such. (*Gardner* v. *Bd. of Health,* 10 N. Y., 409; *Appleton* v. *Water Com'rs.,* 2 Hill, 432; 4 Sand. [S. C.], 153; 1 R. S., 730, §§ 63, 65; 2 Kern., 394; 2 Seld., 358; 20 Barb., 392; 2 R. S., 174, §§ 38, 39; id., 473, §§ 92–108; id., 113, § 2; id., 114, § 5; id., 449, § 12; *U. S.* v. *Boutwell,* 17 Wal., 604; *Ferrin* v. *Myrick,* 41 N. Y., 325; *Austin* v. *Monroe,* 4 Lans., 67; 47 N. Y., 360; *Bloodgood* v. *Lears,* 64 Barb., 71; *Mygatt* v. *Wilcox,* 45 N. Y., 306; 12 Abb. [N. S.], 240; *Bowman* v. *Tallman,* 2 Robt., 385; Story's Eq. Pl'dgs., § 207; 6 Hun, 292.) As the complaint only presents a case against defendants as individuals, no recovery could be had against them as trustees. (*Shuler* v. *Meyrs,* 5 Lans., 170; 19 Barb., 179–184; 2 Seld., 168, 171; 4 id., 472, 474; 22 Mass., 372; *Stilwell* v. *Carpenter,* 62 N. Y., 639; *Austin* v. *Munroe,* 47 id., 367; *Chouteau* v. *Suydam,* 21 id., 179; *Henshall* v. *Roberts,* 5 East, 150; *Cowell* v. *Watts,* 6 id., 405.) The referee erred in receiving in evidence the constitution of the Shaker society. (17 J. R., 158; *Gordon* v. *Secretan,* 8 East.) It was error to admit in evidence the declarations of trust under the complaint, because the subscribing witnesses were not produced to prove them. (2 Phil. Ev., 201; note 193; id., 202; 11 Wend., 136; 9 J. R., 136; 15 Pick., 534; 5 Conn., 383; 13 Wend., 178.) The admissions of defendants, or either of them, were not competent to make out a case. (Cowen's Notes to Phillips' Ev., 230, 373; *Frear* v. *Evertsen,* 20 J. R., 142; *Mauran* v. *Lamb,* 7 Cow., 174; *Davies* v. *Redge,* 3 Esp., 101; 4 Camp., 38.) It was error to receive evidence of a custom among seed dealers in the locality to sell seeds with warranty. (*Smith* v. *Tracy,* 36 N. Y., 79.) The contract of sale being in writing, could not be varied by parol. (*Bonesteel* v. *Flack,* 41 Barb., 435; 1 Pars. on Con., 589; 1 Wend., 424.) The authority to warrant the seeds being conferred upon

both trustees, a warranty, to be valid and binding, must be executed by both. (5 Abb., 268, 198; *Ridgley* v. *Johnson*, 11 Barb., 527; *Thatcher* v. *Crandell*, 3 Keyes, 157; *Brinkerhoff* v. *Wemple*, 1 Wend., 470; *Sinclair* v. *Jackson*, 8 Cow., 543; Wills. on Trusts, 136; 2 Perry on Trusts, § 499; *York* v. *Allen*, 30 N. Y., 104; *Powel* v. *Tuttle*, 3 id.. 396; *Olmstead* v. *Elder*, 5 id., 144; *Martine* v. *Ins. Co.*, 53 id., 339; *Salisbury* v. *Brisbane*, 61 id., 617.) There was not sufficient evidence of any express warranty to justify a recovery. (*Wilmot* v. *Hand*, 11 Wend., 584; 2 Carnes, 48; 1 J. R., 96; 4 id., 421; 1 Wend., 185; 8 Cow., 25; 5 N. Y., 73; Kent's Com. Sales, 1 Den., 378; 20 J. R., 196; 26 Barb., 141; 5 Den., 617.) There was no such evidence of an implied warranty as would entitle plaintiffs to recover. (*Bartlett* v. *Hopbeck*, 34 N. Y., 118; *Howard* v. *Emerson*, 110 Mass., 320; 14 Am. R., 608; *Hoe* v. *Sanborn*, 21 N. Y., 552; Dart's V. and P., 261; *Loomis* v. *Hall*, 15 Pick., 169; *Zule* v. *Zule*, 24 Wend., 76; *Vandaken* v. *Vandaken*, 11 J. Ch., 122; *Gates* v. *Caldwell*, 7 Mass., 68; *Sumner* v. *Williams*, 8 id., 201; *Packhurst* v. *Van Cortland*, 1 J. Ch., 273; *Norton* v. *Woodruff*, 2 N. Y., 153; *Dounce* v. *Dow*, 64 id., 411; 34 id., 118.) The referee erred in allowing interest on the damages. (Sedgw. on Dam., 377; *Gilpin* v. *Consequa*, Peters' C. C. R., 85; *Esterley* v. *Cole*, 1 Barb., 235; *Newell* v. *Griswold*, 6 J. R., 45; *Trotter* v. *Grant*, 2 Wend., 413; *Wood* v. *Hickok*, id., 501; *McKnight* v. *Dunlop*, 4 Barb., 36; *Gallup* v. *Perne*, 10 Hun, 526; *Smith* v. *Velie*, 60 N. Y., 106; *McMahon* v. *N. Y. & E. R. Co.*, 20 id., 469; *Godfrey* v. *Moses*, 3 Hun, 218; *Clark* v. *N. Y.*, 1 Keyes, 9.) Anticipated profits on the crop could not be allowed as damages. (*Passinger* v. *Thorburn*, 34 N. Y., 634, 639; *Ferris* v. *Comstock*, 33 Conn., 513.)

*Esek Cowen*, for respondents. The society of which defendants were trustees was a corporation. (*Thomas* v. *Dakin*, 22 Wend., 94; *Dartmouth College* v. *Woodward*, 4 Wheat., 636; *People* v. *Ass'rs*, 1 Hill, 620; *In re Cooper*, 22

N. Y., 69; *Town of Pawlet* v. *Clark,* 9 Cranch, 292.) The action was properly brought against the society in the name of the trustees in the form of an ordinary action at law. (*Thomas* v. *Dakin,* 22 Wend., 73; Hill on Trustees, 545.) The warranty, having been made by one of the trustees, was binding on the other. (Hill on Trustees, 466.) The constitution of the society was properly admitted in evidence. (Laws 1839, chap. 174; *Betts* v. *Badger,* 12 J. R., 223; *Bk. Monroe* v. *Field,* 2 Hill, 445; *First Bap. Ch.* v. *B'klyn F. Ins. Co.,* 18 Barb., 69.) There was an implied warranty that the seed delivered should be genuine and of merchantable quality. (*Clew* v. *McPherson,* 1 Bosw., 480; *Howard* v. *Hoey,* 23 Wend., 350; *Reed* v. *Randall,* 29 N. Y., 358; *Messmore* v. *N. Y. Shot and Lead Co.,* 40 id., 422; 1 Story Con., § 514; 1 Pars. on Con., 464; 2 Kent's Com., 479; *Hawkins* v. *Pemberton,* 51 N. Y., 198; *Dounce* v. *Dow,* 64 id., 411.) There was an implied warranty that the seed was fit for the purpose for which it was bought. (*Hoe* v. *Sanborn,* 34 N. Y., 552.) The rule of damages adopted by the referee was correct. (Sedg. on Dam., 328, 329; *Griffin* v. *Colver,* 16 N. Y., 489; *Passinger* v. *Thorburn,* 34 id., 634; *Milburne* v. *Belloni,* 39 id., 53; *Messmore* v. *N. Y. Shot and Lead Co.,* 40 id., 422; *Flick* v. *Weatherbee,* 20 Wis., 392; *Park* v. *Morris Axe and Tool Co.,* 9 Alb. L. J., 409; *Wolcott* v. *Mount,* 36 N. J. [7 Vroom.], 272.) Interest from the time the crop would have been harvested and sold was properly allowed. (*Van Rensselaer* v. *Jewett,* 2 N. Y., 135; *Dana* v. *Fiedler,* 12 id., 40; *Fisher* v. *Winans,* 38 Barb., 230.)

ANDREWS, J. The question which first arises in this case is, whether the community of Shakers, called in their constitution "The Church of the United Society in Watervliet," may sue and be sued in the name of the trustees of the society, as the legal or corporate designation of the collective body of members composing the community, upon contracts made by the trustees for the time being of the

society, within their authority, and in the business of such church, society or community.

For many years prior to 1839, there was a society of people called Shakers at Watervliet, in the county of Albany, comprising several hundred members, holding a peculiar religious faith, and united under a covenant subscribed by each member on his admission to the society. The society at Watervliet was an off-shoot of the parent society at New Lebanon, and it is a fundamental rule and principle pervading these communities, that there shall be no individual ownership of property, but that all the property held by individuals on their admission to the society shall be surrendered, and all acquired in the prosecution of its business, shall be held for the common purposes and uses of the aggregate body. The society, although called in the covenant a church, is not solely organized for purposes of religion. The society at Watervliet occupies a large tract of land, and in connection with other branches of industry, is and has been during its existence largely engaged in the raising of garden seeds for sale.

Prior to 1839, the legal title to the property of the society was vested in and held by trustees appointed from its members in trust, for the uses and purposes expressed in the covenant, and subject to the rules, conditions, and regulations therein prescribed. Each trustee executed, upon his appointment, a written declaration of the trust, and their authority and powers were defined in the covenant. They were authorized, and it was made their duty to improve, use, and appropriate the trust property " for the benefit of the church in all its departments "—"to make all just and equitable defense in law, for the protection and security of the consecrated and united interests, rights, and privileges of the church and society," — "to keep, or cause to be kept, regular books of account in which shall be entered the debit and credit accounts of all mercantile operations and business transactions between the church and others." The covenant further provided, that "all the transactions

of said deacons or acting trustees in the use, management, protection, defense, and disposal of the interest (held by them) shall be for the benefit, privileges, and in behalf of the church and society, and not for any private interest, object or purpose whatever;" and the declaration of trust, executed by the trustees, recites that they, in unison with the leading authority of the church, were "empowered to hold, manage, and improve the temporalities of the church for the use and benefit thereof, to buy and sell, and transact business in behalf of the church." Before any statute regulation of the subject, the society seems to have been simply a voluntary association, composed of persons admitted as members under its rules and regulations, having its property vested in trustees, upon a voluntary trust, for the use of the society, but giving the members, as individuals, no separate or distinct ownership therein, nor any interest which they could assign, or which, upon their death, would pass to their heirs or representatives.

The Legislature in 1839 passed an act, entitled " An act in relation to certain trusts," being chapter 174 of the laws of that year. The first section declares that all deeds of trust of real or personal estate, executed and delivered prior to January 1, 1830, to any persons in trust, for any " united society of people called Shakers,", shall be valid and effectual, to vest in the trustees the legal estates and interests conveyed, for the uses declared in such deeds, or declared in any declaration of trust executed by the trustees, in the same manner and to the same effect as before January 1, 1830, and that "such legal estate and trusts, and all the legal authority with which the original trustees were vested, by virtue of their appointment and conferred powers, shall forever descend in regular succession to their successors in office and trust, who, in conformity to the constitution of said society, have been duly chosen and appointed." (See Laws of 1839, as amended by ceapter 373 of Laws of 1849.) The second section authorizes future trusts for the benefit of any society of Shakers to be created, " for the use of the

members of any such society, according to the religious constiution of such society," and provides that the legal estate of any property so held in trust shall be vested in the trustees, " and may be transmitted in trust by the appointment of any such society so long as may be required for the objects and purposes of such trusts," and it prohibits any society from becoming beneficially interested in real or personal property, or from acquiring any right or interest therein, beyond a certain yearly value, " on pain of forfeiture of the privileges conferred by the act." The third section declares that the word "society," used in the preceding section, shall be construed to mean and include all persons being Shakers resident within any county.

It is doubtless true that the primary purpose of this legislation was to give legal sanction to existing trusts created for the benefit of the Shaker societies, and also to authorize the creation of future trusts of the same character, which, if they had not been permitted by special enactment, could not thereafter be created under the provisions of the Revised Statutes. (1 R. S., 728, §§ 45, 55.) But the act of 1839 had a wider scope and meaning than simply the validation or authorization of trusts in favor of these societies. It authorized the holding of the trust property in perpetual -succession by trustees appointed, from time to time, according to the constitution of the Shaker communities. The law operated to vest the title in the successive trustees, without assignment, conveyance or writing. This provision, for a continuous, unbroken succession, was designed for the protection of the societies — the constituent body — and to keep the property free from the difficulties and entanglements, which sometimes happen in case of mere private trusts from the death of a trusteee, without provision for legal succession. The authority to have the property held by trustees in perpetual succession, is essentially a corporate power. Blackstone, in speaking of this, says, " this " (the power to have perpetual succession) " is the very end of the incorporation, for there cannot be a succession

forever without an incorporation." 1 Bl., 475, and COWEN, J., in *Thomas* v. *Dakin* (22 Wend., 102), says: "The grand test of a corporation is the mode by which property succeeds from one to another. When it does not go to the heirs of the holder as a natural person, it passes to the successor or successors, because it is holden in a corporate capacity."

We do deem it necessary to hold, in order to maintain the right to sue the society of Shakers at Watervliet in the name of the trustees, that the act of 1839 constituted either the society or its trustees, a corporation, in a full and unrestricted sense. But we are of opinion that the trustees may and should be regarded as a corporate body, and the property held by them as corporate property, for the purposes of the remedy by suit, to enforce any authorized contract made by them for the society. It is apparent that the prosecution of business, and the making of contracts connected therewith, was one of the purposes contemplated in the organization of the Shaker societies. This was not a mere incident to the religious features of the organization. It is also clear, that the acquisition of property as the result of business enterprizes, in which the society should engage, was contemplated. The management of the property and business of the society at Watervliet was committed to the trustees. They represented the society in its business affairs, and the provisions of the constitution, to which reference has been made, clearly show that they were invested with the power to make all ordinary contracts relating to the temporal affairs of the community. It was impracticable for a society consisting of two hundred or more members, which were constantly changing through deaths, withdrawals, and the admission of new members, to conduct its business, except through general agents empowered to act for the collective body. The general rule applicable to contracts made by ordinary trustees, is that they are deemed in law to be the personal contracts of the individuals who make them, and cannot be enforced against the trust property by a common-law action,

or in equity, unless they are contracts for the benefit of the trust estate. But when contracts are made by trustees under a power contained in the deed or instrument creating the trust, they bind the trust property, and a court of equity will appropriate it, if necessary, to satisfy the claims of contract creditors, whether the contract turns out to be beneficent to the estate or otherwise. For example, if a testator directs that a trade, in which he was engaged, shall be continued by his executors, his assets, so far as they are invested therein, will be liable in equity to the debts of the business. (*Ex parte Richardson*, 3 Mod.; *Ex parte Garland*, 10 Ves., 119.) And upon the same principle, we think contracts made by the trustees of the Shaker society, pursuant to the power conferred upon them by the covenant or constitution, would be enforced in equity against the property of the society in their hands, assuming that they occupied the position of ordinary trustees merely.

The question here is, are the plaintiffs, if they have a valid claim for damages under an authorized contract made by the trustees in the business of the society, bound to seek their remedy either against the trustees personally, or by a suit in equity to reach the trust property, making in that case, as they would be bound to do according to the general rule of law, all the members of the society parties? (Hill on Trustees, 545.) The personal remedy against the trustees, as individuals, in view of the fact that, by the constitution of the society, they are not allowed to have or hold property in their own right, would be manifestly worthless. The remedy by suit in equity against the *cestui que trust* and trustees to charge the trust estate, would be difficult, dilatory and expensive, and would, in cases of small demands, amount to a practical denial of justice. The members of the society hold a peculiar relation to the property. They do not hold any interest in it as natural persons, so as that they can alien it, or which, upon their death, they can transmit to their heirs or next of kin. We think the reasonable conclusion is, that the trustees hold the property in a quali-

fied corporate capacity, and that actions may be brought against the society, designating the defendant as "trustees of the mutual society called Shakers," and that judgment in the action will, when docketed, become a lien on the real estate held by the trustees, and may be collected out of the real or personal property in their hands, as in case of judgment against individuals.

The judgment rendered in this case is against two individuals named, followed by the statement "as trustees of the mutual society called Shakers," and it is claimed that the action in form is against them as individuals, and that judgment against the society could not be rendered therein. It is difficult to determine from a perusal of the complaint, whether the pleader intended to sue the society or the individuals who were trustees; but the action was tried upon the assumption, by both parties, that the suit was brought against the society, and no question was made as to the form or sufficiency of the pleadings, for the purpose of determining the issue tried, viz: the liability of the society upon the facts proved. It is now too late to raise the objection that the pleadings were insufficient or defective.

We come now to the consideration of the questions involving more directly the merits of the action. The question whether there was a warranty by the defendants, that the seed sold to the plaintiff was "genuine large Bristol cabbage seed," which is the warranty found by the referee, must be deemed to be established by his finding, unless it is without support in the evidence. The contract for the purchase and sale of the seed was made under these circumstances: The defendants were growers of garden seeds for sale, and the plaintiffs were market gardeners raising vegetables for sale in the market. In 1867 they bought of the defendants cabbage seed, of the variety known as large Bristol cabbage seed, which produced Bristol cabbage. In the fall of 1867, Miller, one of the trustees of the defendants, informed the plaintiffs that they had raised that year 200 pounds of Bristol cabbage seed, like that the plaintiffs had had, and solicited them to come

early if they wished any. In February, 1868, the plaintiffs went to the seed store of the defendants to purchase seeds, and on making their business known to the defendants' clerk, he produced a printed catalogue of the seeds the defendants had for sale, and exhibited it to the plaintiffs; and among the seeds in the list, was large Bristol cabbage seed. The plaintiffs then ordered seeds of different kinds, and among others, six pounds of "Bristol cabbage seed." The clerk made a memorandum of the kind and amount of seeds ordered, and promised to deliver them to the plaintiffs within a few days. Some days afterward the clerk put up the seeds, including six pounds of cabbage seed, and delivered them at Aikin's store, in Albany, for the plaintiffs, with a bill of parcels, as upon a sale by Miller to the plaintiffs. The cabbage seed was described in the bill as "six pounds large Bristol cabbage" seed.

The doctrine that a bargain and sale of a chattel of a particular description imports a contract or warranty that the article sold is of that description, is sustained by a great weight of judicial authority. The cases of *Seixas* v. *Wood* (2 Caines, 48), and *Swett* v. *Colgate* (20 J. R., 196), based mainly upon the authority of the case of *Chandler* v. *Lopas* (Cro. J., 4), are, it must be admitted, adverse to this view. The case of *Chandler* v. *Lopas* has been overruled in England, and the cases in this State referred to have been often questioned, and Chancellor KENT, who took part in deciding *Seixas* v. *Wood*, intimates in his commentaries a doubt whether the case was correctly decided. (2 Kent, 479.) The case of *Hawkins* v. *Pemberton* (51 N. Y., 198), adopts, as the law in this State, the doctrine upon this subject now prevailing elsewhere, that a sale of a chattel by a particular description, is a warranty that the article sold is of the kind specified; and this case was recognized in *Dounce* v. *Dow* (64 N. Y., 411), as modifying the doctrine of *Seixas* v. *Wood*, and *Swett* v. *Colgate*. We think the modern doctrine upon the subject is reasonable, and proceeds upon a just interpretation of the contract of sale. A dealer who sells an arti-

cle, describing it by the name of an article of commerce, the identity of which is not known to the purchaser, must understand that the latter relies upon the description as a representation by the seller that it is the thing described; and this constitutes a warranty. We content ourselves without further argument, with referring to some of the cases bearing upon this question, which must, we think, be regarded as decisive. (*Barr* v. *Gibson*, 3 M. & W., 390; *Budge* v. *Main*, 1 Har., 505; *Shepherd* v. *Kain*, 5 B. & Ald., 210; *Baker* v. *Barness*, 3 B. & S. 749; *Allan* v. *Lake*, 18 Ad. & El. [N. S.], 561; *Power* v. *Barbour*, Ad. & El., 473; *Bomerkin* v. *Beva,n* 3 S. & R., 37; *Henshaw* v. *Robbins*, 9 Met., 83; *Hawkins* v. *Pemberton, supra*.)

The referee was, therefore, justified in finding that the defendants warranted the seed sold to the plaintiffs to be large Bristol cabbage seed, from the fact that the plaintiffs applied to purchase that description of seed; and that the seed delivered was designated in the bill of parcels as large Bristol cabbage seed. The fact that Chauncey Miller was named in the bill of parcels as vendor, did not preclude the plaintiffs from treating the transaction as a sale by the defendants, and the representation as having been made by them. Miller was, in fact, acting as their agent. The negotiation for the purchase of the seed was made at the store of the society some days before it was delivered. It was sent in compliance with the plaintiffs' order made at that time. The bill of parcels was made for the purpose of showing that the seed sent corresponded with the order and the amount of the purchase, and not to show that the contract was the contract of the agent, or that he was the vendor, and not the society. The plaintiffs could, perhaps, have elected to treat the warranty as the individual warranty of Miller, but they were not confined to that remedy. If, in fact, the sale was by the defendants, the plaintiff had the right to treat the contract and representation as theirs. The claim, that the trustees had no power to bind the society by the warranty in question, is not well founded. They

had, as an incident to their power to make contracts of sale, the power to give the article sold a name and descriptive character; and, upon the warranty arising from a sale of seeds by designation, the society is clearly bound, irrespective of the question whether the trustees had general authority from the society to make an express warranty on sales. Aside from the warranty raised in this case by the description in the bill of parcels, there was, also, upon the sale in question, within the authority of *Hoe* v. *Sanborn* (21 N. Y., 552), a warranty implied by law, that the seed sold were free from any latent defect arising from the mode of cultivation. It was decided in *Hoe* v. *Sanborn*, that upon a sale of a chattel by a manufacturer, a warranty is implied that the article sold is free from any latent defect growing out of the process of manufacture. The rule is based on the presumed superior knowledge of the vendor; and there seems to be the same reason for implying a warranty on a sale of seeds by the grower, that they are not defective from improper cultivation, as to imply a warranty of freedom from defects in the manufacture, on a sale by a manufacturer of the article made by him. The grower of seeds must be presumed to be cognizant of any omissions or negligence in cultivation, whereby they have been deteriorated or rendered unfit for use.

It is claimed by the defendants that there was no breach of any warranty shown, assuming that a warranty was proved, for the reason that the seed sold were large Bristol cabbage seed. That the seed were Bristol cabbage seed is, as the defendants insist, established by the fact that they grew upon stocks of Bristol cabbage. The referee finds that the seed was raised upon Bristol cabbage stocks, but he further finds that these stocks were planted in the vicinity of stocks of other varieties of cabbage, and were fertilized by the pollen therefrom, and that, in consequence of the crossing of the varieties, the seed grown upon the Bristol cabbage stocks became impure, and were not genuine Bristol cabbage seed, but lost that character and quality, and

that the plants raised by the plaintiffs from the seed purchased from the defendants, with a very few exceptions, in consequence of such crossing, were of no known variety of cabbage, and were of no value except as food for cattle. The evidence on the part of the plaintiffs shows that they set out 105,000 plants raised from this seed, of which 100,000 lived and grew vigorously, but about 200 only produced Bristol cabbages. That the defendants intended to sell, and the plaintiffs to buy seed, which under proper cultivation, if it grew at all, would produce Bristol cabbages, is evident. The defendants knew that the plaintiffs were market gardeners, and desired this particular variety of seed. Bristol cabbages were regarded as a valuable variety for marketing. The defendants raised the seed, and it was not Bristol cabbage seed, within the meaning of the warranty, whatever its botanical or scientific designation might be, unless it would produce Bristol cabbages. Whether the seed was Bristol cabbage seed within the warranty, depends not upon the origin of the seed, or the stocks upon which it grew, but upon the fact whether Bristol cabbages as known in the market could be raised therefrom. The contention of the defendants that the warranty was not broken, if technically, or in the language of botanists, the seed was Bristol cabbage seed, cannot therefore be sustained. But, if the defendants are right upon this point, the question would still remain whether there was a breach of the implied warranty ; that the seed was free from defects arising from improper and negligent cultivation.

The referee, in fixing the damages, followed the rule laid down in *Passinger* v. *Thorburn* (34 N. Y., 634), which was also an action for a breach of warranty, in the sale of cabbage seed. The defendant in that case warranted the seed to be Bristol cabbage seed, and that it would produce Bristol cabbage. The court held, all the judges concurring, that the plaintiff was entitled to recover the difference in value between the crop raised from the defective seed, and a crop of Bristol cabbage, such as would ordinarily have been produced in the year in which the seed was to be sown.

The learned judge, who delivered the opinion, referred to a large number of authorities as sustaining the rule of adopted by the court; and, among others, to the case of *Randall* v. *Roper* (E. B. & E., 84), in which it was held that in an action on a warranty, made by the defendants to the plaintiff, on a sale by the former to the latter of seed barley, that the seed sold was " chevalier " seed barley, but which was, in fact, barley of an inferior quality; the plaintiffs, who had resold the barley, with a similar warranty, could recover of their vendors the loss sustained by the sub-vendees, measured by the difference in value between the inferior crop produced and that which might have been produced from " chevalier " barley.    The case of *Passinger* v. *Thorburn* was approved in *Milburn* v. *Belloni* (39 N. Y., 53), and was said by the court to be decisive of the case then under consideration.    In *Wolcott* v. *Mount* (36 N. J., 262), and *Fleck* v. *Weatherton* (20 Wis., 392), the rule adopted in *Passinger* v. *Thorburn* was approved and applied by the court.    We think the case of *Passinger* v. *Thorburn* should be adhered to.    It was carefully considered and decided, and we are not prepared to say that the rule there adopted is a departure from correct principle.    Gains prevented, as well as losses sustained, may recovered as damages for a breach of contract, where they be can be rendered reasonably certain by evidence, and have naturally resulted from the breach.    (*Masterton* v. *The Mayor, etc.*, 7 Hill, 61; *Griffin* v. *Colver*, 16 N. Y., 489; *Messmore* v. *The N. Y. Shot and Lead Co.*, 40 N. Y., 422.) But mere contingent or speculative gains or losses, with respect to which no means exist of ascertaining with any certainty whether they would have resulted or not, are rejected, and the jury will not be allowed to consider them. Can it be said that the damages allowed in *Passinger* v. *Thorburn* are incapable of being ascertained with reasonable certainty by a jury ?

The character of the season, whether favorable or unfavorable for production; the manner in which the plants set were cultivated; the condition of the ground; the results observed

in the same vicinity where cabbages were planted, under similar circumstances; the market value of Bristol cabbages when the crop matured; the value of the crop raised from the · defective seed; these, and other circumstances, may be shown to aid the jury, and from which they can ascertain approximately the extent of the damages resulting from the loss of a crop of a particluar kind.

The referee allowed interest on the damages from the time the crop would have been harvested and sold. We are of opinion that this was erroneous. The demand was unliquidated, and the amount could not be determined by computation simply, or reference to market values. (*McMahon* v. *N. Y. & E. R. R. Co.*, 20 N. Y., 469; *Smith* v. *Velie*, 60 id., 106; Sedg. on Dam., 377.)

The remaining questions arise upon exceptions taken by the defendants to the admission or rejection of evidence, and without passing upon the validity of the other exceptions of this character, we are of opinion that the referee erred in allowing the conversation between Chauncey Miller and the plaintiff White, at the interview between them, in the fall of 1868, to be given in evidence. This conversation occurred nearly eight months after the sale of the seed, and the making of the warranty upon which the action is brought. If the declarations of Miller on this occasion were admissible to bind the society, they furnished very material evidence to sustain the plaintiff's case. The plaintiffs sought to establish, among other things, that the defect in the seed was owing to improper and negligent cultivation, thereby raising an implied warranty, in addition to the warranty arising out of the description in the bill of parcels; and it was also an essential part of their case, to establish that the seed sold were not Bristol cabbage seed; and this they sought to show, by proving by gardeners and other persons who had purchased seed of the defendants of the same kind as that sold to the plaintiffs, that their crops had also failed, and that the seed did not produce Bristol cabbage. The admissions of Miller, in the conversation

proved, tended to establish both of the facts referred to, viz: that the seed was inferior and mixed, owing to improper cultivation, and that it would not produce Bristol cabbage. He stated, in the conversation, that the impurity of the seed was owing to planting the Bristol cabbage stocks in the vicinity of stocks of the red cabbage, and that the society had, in consequence of the defective character of the seed, lost their own crops of cabbage in that year. The proof of this conversation was objected to on several grounds; and, among others, that the declarations of Miller, when not engaged in the business of the society, were not admissible. The general rule is, that what one person says, out of court, is not admissible to charge or bind another. The exception is in cases of agency; and in cases of agency, the declarations of the agent are not competent to charge the principal, upon proof merely that the relation of principal and agent existed when the declarations were made. It must further appear that the agent, at the time the declarations were made, was engaged in executing the authority conferred upon him, and that the declarations related to, and were connected with the business then depending, so that they constituted a part of *res gestæ*. In *Farlie* v. *Hastings* (10 Ves., 127), Sir WILLIAM GRANT expressed, with great clearness and accuracy, the doctrine upon this subject. He said: "What an agent has said may be what constitutes the agreement of the principal; or the representations or statements made may be the foundation of, or the inducement to the agreement. Therefore, if a writing is not necessary by law, the evidence must be admitted, to prove the agent did make that statement or representation. So, with regard to acts done, the words with which these acts are accompanied frequently tend to determine their quality. The party, therefore, to be bound by the act, must be affected by the words. But, except in one or the other of these ways, I do not know how what is said by an agent can be evidence against the principal. The mere assertion of a fact cannot amount to proof of it, though it may have

some relation to the business in which the person making that assertion was employed as agent." (See, also, Sto. on Ag., §§ 134, 137 ; *Thallheimer* v. *Brinckerhoof*, 4 Wend., 394; *Hubbard* v. *Elmer*, 7 id., 446; *Luby* v. *H. R. R. R. Co.*, 17 N. Y., 131.) The rule that the declarations of the agent are inadmissible to bind the principal, unless they constitute the agreement which he is authorized to make, or relate to and accompany an act done in the course of the agency, is applicable in all cases, whether the agent is a general or special one, or the principal is a corporation or private person. (Angell & Ames on Cor., § 309; 1 Gr. Ev., § 114a.)

The conversation with Miller was inadmissible within the rule stated. It was not a part of any contract between the society and the plaintiffs, nor was it connected with any business which Miller was at the time transacting for the defendants. The plaintiffs had not then, so far it appears, made any claim that the defendants were liable on the warranty, or that the failure of the crop was owing to a defect in the seed. The plaintiff White states that up to the time of the conversation, he had not been able to account for the failure. He had written to Miller before the conversation, and requested him to look at the crop, and to explain, if he could, the cause of the failure; and, not receiving an answer, he went to see Miller, when the conversation referred to occurred. Miller at this time made no contract or arrangement with White for a settlement or adjustment of any liability incurred by the society, and he had no authority to bind the society if he had attempted to do so, to pay the large damages subsequently claimed by the plaintiffs. The covenant expressly declares that no important contract made by the trustees shall be considered valid without the previous approbation of the ministry and elders. An agreement to pay several thousand dollars damages on a sale of thirty-six dollars' worth of seed, would be an important contract, beyond the power of the trustees alone, to make.

For these reasons, we are of opinion that the referee erred in the admission of the conversation in question.

The evidence was important, and we cannot say that it did not influence the result. For the error in admitting it, the judgment should be reversed and a new trial granted.

All concur.

RAPALLO and MILLER, JJ., concur in opinion as to question of evidence, and in result on other grounds.

Judgment reversed.