### ROTHSTEIN et al. v. ISAAC.

(Supreme Court, Appellate Division, First Department. February 7, 1908.)

1. VENDOR AND PURCHASER—RESCISSION BY PURCHASER—GROUNDS—FRAUD— EVIDENCE—SUFFICIENCY.

In an action to annul a contract of sale of realty as having been procured by fraud and misrepresentation by the vendor's agents and brokers, evidence examined, and *held* insufficient to show authority upon the part of such agents or brokers to sell, or to make the representations complained of.

2. SAME—EVIDENCE—ADMISSIBILITY.

Where, in an action to annul a contract as having been procured by fraud and misrepresentation by an alleged agent of the vendor, the evidence was insufficient to show authority of such agent either to sell or to make the representations alleged, evidence as to a conversation between the purchaser and such agent, in which the agent admitted that the rental value of the property was not what he had represented it to be, was not admissible.

3. SAME.

That an agent of the vendor of certain real property, who was in charge thereof, but who had no authority to sell it, and did not assume to have such authority, and who could not read English, unintentionally made a mistaken representation as to the rental value of the property, by saying that a certain written statement, which was shown him, of the rents to be derived from the property was correct, was not evidence of fraud on the part of the vendor which would justify a rescission of a contract subsequently made by the vendor with the person to whom the alleged misrepresentation was made.

Houghton, J., dissenting.

Appeal from Trial Term.

Action by Samuel Rothstein and others against Isidore Isaac, to annul a contract for the sale of realty. From a judgment for plaintiffs, and from an order denying a motion for a new trial, defendant appeals. Reversed, and new trial ordered.

Argued before PATTERSON, P. J., and McLAUGHLIN, INGRAHAM, LAUGHLIN, and HOUGHTON, JJ.

Martin Paskus, for appellant.
Harry A. Gordon, for respondents.

INGRAHAM, J. By a contract executed the 12th day of October, 1904, the defendant agreed to sell and the plaintiffs agreed to purchase certain real property, consisting of two lots of land on Madison street upon which was a tenement house. The price to be paid therefor was $78,000, of which $2,000 was paid on or before the signing of the contract; $8,000 was to be paid in cash upon delivery of the deed; $45,000 by taking said premises subject to a mortgage then a lien on the property; and the balance of $23,000 by the execution of a second mortgage—the deed to be delivered on the 15th of November, 1904. The plaintiff did not complete the contract, but on the 18th of November, 1904, commenced this action—the complaint alleging that the contract had been procured by fraud, asking that it be canceled and annulled, and for judgment against the defendant for the $2,000 paid in cash on the contract and for $400 damages; the fraud consisting of representations made by the defendant that the premises brought in an actual rental of $8,478 per year and that there was to be built a tenement house adjoining the said premises immediately on the east thereof, the light shaft or light and ventilation area of which would be on the westerly side of said new building and immediately adjoining the light shaft or light and ventilation area of the said premises which the plaintiffs had purchased, and it being stated that the owner of the said lot had already filed plans in the building department, which were approved, showing and requiring the said light shafts or light and ventilation open spaces or area to be immediately adjoining said light and ventilation area of the said premises. It was also alleged that the rental of the said premises was not the sum of $8,478 per year, but were far and materially less than said sum; that the defendant well knew that the owner of the said adjoining lot on the east did not intend to erect a building on the said lot with the light and ventilation shaft or area immediately adjoining the premises in question, but that the owner of the adjoining premises intended placing the light and ventilation area on the easterly side thereof and not adjoining the premises mentioned in the agreement. The case was tried before a jury, who found a verdict for the plaintiffs, and from the judgment entered thereon the defendant appeals.

One of the plaintiffs testified that his attention was called to this property by a broker named Abrams, and that Abrams and another broker, named Greenberg, introduced him to the defendant. The plaintiffs then called the defendant, who testified that he made the contract in question and paid the brokers' commissions for effecting the

sale after the contract was made; that the defendant did not place
the property in the hands of the brokers for sale, but that the defend-
ant's father had authority to sell the property for the defendant, and
had authority to employ brokers for that purpose. On cross-examina-
tion the defendant was asked by his counsel:

"Did you ever authorize your father, or any one else, to make any repre-
sentations as to the rent which this property was to bring in?"

That was objected to as immaterial, irrelevant, and incompetent,
and the objection sustained, upon the ground that anything said by any
of the brokers that induced the plaintiffs to make this contract, if that
saying or representation was false, was the act of the principal. To
this defendant excepted. The defendant then testified that he did not
tell his father to sell the property, and that his father did not sell the
property for him; that he knew nothing about the brokers, except
that his brother had told him that they were the real estate brokers who
brought the plaintiffs, and he paid the brokers for bringing about the
contract.

William Isaac, the defendant's brother, was then called as a witness
for the plaintiffs, and testified that the defendant authorized him to set-
tle with the brokers; that he never saw the brokers until they brought
the plaintiffs to him as purchasers of the property. On cross-examina-
tion he was asked whether he, at any time prior to the execution of
the contract, authorized any of these brokers to make any representa-
tions to any one or to the plaintiffs as to the rents or to make any other
representations. That was objected to, and the objection sustained,
on the ground that the question was not proper cross-examination.
The plaintiffs then called Emanuel Isaac, the defendant's father, who
testified that he had authority to collect the rents of the premises for
the defendant; that the defendant had said that when they got a good
price for the house they would sell it; that the witness was in the real
estate business; that he would not sell the house unless the defendant
was present, and had nothing to do with and never engaged any brok-
ers; that the brokers never had brought the plaintiffs to the witness,
and he never had any talk with them on the subject.

One of the plaintiffs was then recalled, and said that the broker
Abrams "brought me to buy the house"; that the broker then went
with the witness to William Isaac, the defendant's brother, and to
Emanuel Isaac, the defendant's father; that he gave a check for $200
as a deposit on the purchase of the property; that as a result of
what Abrams told the witness he went to the premises and saw the
janitress; that the brokers told him to go to No. 86 Bowery, where
he would meet the father of the owner; that before the father came
in the defendant's brother talked with him about the property, and
when the father arrived he had a talk with him. He was then asked
what the father of the defendant said, which was objected to by the
defendant. That objection was overruled, and the defendant except-
ed. The witness then said: That after he made the defendant's broth-
er an offer the brother said: "Wait for my father. He has more
authority and he will— See what he says. He will sell it for you."
That when the defendant's father came in he made an offer of $76,-

000, and they finally agreed on $78,000 as the price to be paid for the property. That "I asked him then if the rents brought in the way I got it from the janitress." That the witness had a memorandum, and asked the father "if the rent as given to me by the janitress was correct. He went over this, and it was correct; that he collected the rents and paid the same over to him [the defendant]. * * * He said these were the correct rents the property brought in at the time, between $8,400 and $8,500 per year." The plaintiffs then offered this memorandum in evidence, which was objected to by the defendant. That objection was overruled, and the defendant excepted. This is a memorandum with certain figures upon it which, added together, made a total of $706.50, and which is multiplied by 12, making $8,478. There is nothing on the face of this paper which connects it with the premises in question. The witness then continued:

"Then I asked him about the vacant lot next door; that the broker Abrams, who proposed the parcel, told me they began to build so to obstruct the light of the premises adjoining to the east of 306 Madison street."

Counsel for the defendant then moved to strike out this testimony as to the conversation with the defendant's father, and also objected to the testimony on the ground that it was incompetent and immaterial. That motion was denied, and the objection overruled, to which the defendant excepted. The witness then stated:

"After that time, E. Isaac [defendant's father] told me that he knew the builder, the owner of the lot adjoining 306—his building. It was the same builder who built his house—his son's house—306–308 Madison street, and that this builder— He knew this builder, and he knew that the builder had already filed plans for a new six-story tenement building upon the adjoining lot, and that the builder—that these plans were approved, and the builder showed him the approved plans, and that such plans showed that the area for the shaft adjoining to the east of 306–308 Madison street would be so large, according to the latest tenement house law, that it would not at all obstruct the light of the windows, 306–308 Madison street, the house I was to buy. Then he told me, further, that I would have 13 feet wide of airshaft, double— twice—the airshaft of the existing 306–308 Madison street. It would be twice as wide."

After this answer was in the court struck out what the witness told the defendant that Abrams had told him, when defendant again moved to strike out all the conversation with Emanuel Isaac on the ground that it was not binding upon the defendant, which motion was denied. The court then, over the objection and exception of the defendant, allowed further testimony as to what E. Isaac said in relation to this open court. The plaintiff then testified that about four days before the time set for the closing of the title he again saw the defendant's father. He was then asked what the conversation at that time was, to which the defendant objected. Counsel for the plaintiffs then said that he intended to prove an admission by the father that the property did not bring the rents indicated upon this memorandum. That was objected to, the objection overruled, and the defendant excepted. The witness then testified that he saw the defendant's father and told him that he had found out from the janitress that the rents were altogether wrong; that when she collected

the rents she gave a certain receipt, which called for more than she received by $2, and thus collected less than the receipt called for; that she had been instructed by the landlord to do this; that defendant's father then said that when the plaintiffs got the property they could raise the rents. The defendant then made a motion to strike out all this testimony in relation to what the janitress said, which motion was denied, and the defendant excepted. The witness then, notwithstanding the objection and exception of the defendant, was allowed to testify that he told E. Isaac (defendant's father) that he had found out that the rents were altogether wrong, and that the property would only bring about $7,800 a year, and not $8,478, as was represented; that the witness also told defendant's father that, instead of giving him an airshaft on the adjoining building, they were going to put up a blind wall; that the defendant's father said that, when he gave to the witness the rent memorandum "that the property would bring in that amount represented, $8,478, it did only actually bring $7,800 per year; that everybody is raising rent, and I can do the same. I could easily have it bring in that amount as represented, if I should raise the rent. Well—and as to the adjoining wall, that the builder is building the wall that way to extort money from me"; that if the plaintiffs would give the builder $500 or $1,000, he would change the wall. The defendant again moved to strike out all this answer relating to the conversation, which motion was denied, and the defendant excepted. Defendant then further moved to strike out the testimony so far as it related to the fact that the property only brought $7,800 in rentals. That motion was denied, and the defendant excepted. On cross-examination this witness testified that he had examined the property before he made the contract with the broker; that he examined everything at the property; that one tenant told him she paid $29 for the second floor, and that amount corresponded with this written statement; that neither the defendant nor his father or brother was with him at the time he made the examination, and that he got this statement as to the rents from one of the brokers; that he bought this property, relying on the representations of the real estate brokers as to what the premises were being let for; that it was his first experience, and he thought they were telling the truth; that when the contract was signed and the defendant present the witness never stated that any representations had been made to him about the rents or about the building on the adjacent property. It was then proved that the plans filed for the building on the adjoining property did not show any airshaft adjoining the property in question. Upon this testimony the plaintiffs rested, and defendant moved to dismiss the complaint, which motion was denied. The defendant and his father and brother all testified they never saw this paper in relation to the rents, and made no representations about them, and made no representations as to the adjoining building.

The testimony as to these alleged representations is not satisfactory. The representations are based upon a statement with which neither the defendant nor his representatives had anything to do. When this statement was handed to the defendant's father, who had general charge of

the property and was authorized to sell it, the plaintiff testifies that the father said that this statement was correct. The father testified that he is unable to read English. Even by the plaintiffs' testimony it does not appear that the figures were discussed, and all concerned in the transaction on behalf of the defendant expressly disclaim ever having seen the paper or making any representations about the amount of the rents. The relation of the defendant's father to the sale was not that of agent to sell the property, which would charge the defendant with all representations made to him in relation to it on his behalf; nor did the father, acting for the defendant, actually sell the property. The agreement with the father was conditioned upon the assent of the defendant, and he it was who signed the final contract; and, while there is evidence that the father of the defendant had general charge of the property, it does not appear that he assumed to exercise an authority to sell the property. There is no evidence that the brokers were ever employed by the defendant, or pretented to act under any authority received from him, in relation to the property. They seem to rely upon the general custom that the owner of property, selling it to a customer produced by a broker, will pay the commission; but there was no authority to the brokers to procure a purchaser, and when they made the representation to the plaintiff they were not the defendant's agents. Taking the whole evidence together, there is much reason for the inference that these plaintiffs were beset by the brokers, and relied to some extent on what they said in relation to the property; but at the time they made such representations they were acting for the plaintiffs, and not for the defendant, and the plaintiff testified that he relied upon the solicitations and representations of the brokers. Whatever authority, however, the father had to act for the defendant, there is not the slightest evidence to justify the inference that the father had any authority, express or implied, to make representations or admissions to the plaintiffs after the contract had been signed and just before it was to be complied with. The court, notwithstanding the strenuous objection of the defendant, admitted evidence of a most damaging conversation between the plaintiff and the defendant's father. He was asked as to this interview four days before the contract was to be complied with, which questions were objected to by the defendant. The court then said to the plaintiff's counsel:

"If you desire to prove an admission by the father that the property did not bring this rent, that I think was all right."

The plaintiff's counsel having stated that that was what he intended to prove, the objection was overruled, to which the defendant excepted. The witness then went on to say that he told the defendant's father that he had found out from the janitress that the rents were altogether wrong; that when she got the rents she gave a certain receipt, which called for more than she got by $2, and that she was instructed by the landlord to do this; and then testified to an admission by the father of the defendant that the rents were $7,800 and not $8,478, as it was alleged had been represented, and that each apartment brought $2 less than represented. Whatever may be said as to the responsibility of the defendant for representations made by his father prior to the time

the contract was signed, this testimony was clearly incompetent. The account of this conversation was expressly denied, and there was no evidence that the janitress made any such statement, or that the statement, if made, was true; and yet it can easily be seen that evidence of such a combination between the defendant's agent and the janitress would be extremely damaging with the jury. I think this evidence was clearly incompetent and requires us to reverse the judgment. White v. Miller, 71 N. Y. 118–134, 27 Am. Rep. 13.

There was also an error in the charge, which I think calls for the reversal of this judgment. The court charged the jury that:

"If the agent of the defendant, with intent to deceive the plaintiffs, made representations as to the rentals of the property, and those representations were untrue and material in inducing the plaintiffs to purchase, the plaintiffs had the right to rescind the contract and to recover in this action."

And again, in restating the proposition:

"If the defendant, through his agent, made the statements claimed to have been made by the plaintiffs, and plaintiffs were thereby influenced to enter into the contract, and the statements proved to be untrue, to the plaintiffs' prejudice, plaintiffs are entitled to recover. It is not even necessary that the statements should have been intentionally false."

And to that proposition the defendant excepted. I think this was error. These plaintiffs were not dealing with the defendant, nor were they dealing with any one who had assumed to act as an agent of the defendant to make the contract in question, as the contract was finally made by the defendant, and only after he had himself accepted the proposition. I know of no rule of law which holds an unintentional mistake in relation to such a representation by a general agent as evidence of a fraud which would justify the rescission of a contract made by the principal; and I think it was entirely misleading to say to the jury that they could find the fraud which was essential to a disaffirmance of this contract from a purely unintentional error made by an agent under such circumstances. As before stated, the plaintiffs presented to the defendant's father a statement of the rents of this property, and it is alleged that the father went over that statement and said that it was correct. The evidence is undisputed that the defendant's father was not able to read English, and there certainly could be no fraudulent representations for a purely unintentional error in such a statement, which the person to whom it was submitted was unable to read.

The judgment and order must be reversed, and a new trial ordered, with costs to the appellant to abide the event.

McLAUGHLIN and LAUGHLIN, JJ., concur. PATTERSON, P. J., concurs in result. HOUGHTON, J., dissents.