(158 App. Div. 461.)

COLEMAN v. SIMPSON, HENDEE & CO.

(Supreme Court, Appellate Division, Second Department. October 3, 1913.)

1. SALES (§ 266*)—WARRANTIES—IMPLIED WARRANTY AGAINST LATENT DEFECTS.

There is no implied warranty against latent defects in a sale of goods, unless the seller is the producer or manufacturer thereof, notwithstanding the seller knows the purpose for which the goods are bought.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 743, 746, 747, 754–759; Dec. Dig. § 266.*]

2. SALES (§ 264*)—WARRANTIES—IMPLIED WARRANTY OF IDENTITY.

There is an implied warranty on the part of every seller, whether manufacturer or not, that the article sold is identical with the article bought.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 752, 753; Dec. Dig. § 264.*]

3. SALES (§ 266*)—WARRANTIES—IMPLIED WARRANTY AGAINST LATENT DEFECTS.

Where, in pursuance of a contract to furnish a car of "fancy clip't seed oats," the seller, who was merely a middleman, furnished a car of oats of that general description, the fact that there was a latent defect

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in the oats which prevented their germinating, of which the seller had no knowledge, did not render him liable to the buyer, as there was no implied warranty as to quality.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 743, 746, 747, 754–759; Dec. Dig. § 266.*]

Appeal from Trial Term, Dutchess County.

Action by John D. Coleman against Simpson, Hendee & Co. for breach of warranty in a sale of seed oats. From a judgment for plaintiff, defendant appeals. Reversed, and new trial granted.

Argued before JENKS, P. J., and THOMAS, CARR, STAPLETON, and PUTNAM, JJ.

Schuyler C. Carlton, of New York City, for appellant.
Morschauser & Mack, of Poughkeepsie, for respondent.

CARR, J. In 1911 the plaintiff was a dealer in grain at Pawling, N. Y., and as a part of his business he sold oats to farmers for planting purposes. The defendant, a corporation, was engaged in the general business of selling grain at wholesale, generally in car load lots. It had an agent, one Merriam, who went about soliciting orders. In January of that year Merriam called upon the plaintiff and obtained an oral order for a car load of oats, which order was given by the plaintiff in manner as follows (using his own words):

"I asked Mr. Merriam to furnish me a car of extreme Northern grain seed oats; that our people were cranks on seed oats, and I wanted him to give us something nice, and I was willing to give him one or two cents over the feed oats price. Mr. Merriam said he would see I had an extra fine car. That was all that was said that day. Mr. Merriam had been in the habit of going there to my place of business, and knew what I was doing, selling seed oats and other things."

Merriam transmitted this order to the defendant, who thereupon sent to the plaintiff a "confirmatory" letter, partly printed and partly written, in which the defendant confirmed a sale to the plaintiff of "one car * * * heavy fancy clip't seed oats * * * at 42½" cents (a bushel), to be shipped "Feb'y 15th, or later; terms, usual." The defendant, as plaintiff well knew, did not raise the grain it sold, but simply purchased the same in the West, generally in the Chicago market, and had the car loads shipped directly from Chicago to its customers. The practice was to send along a bill of lading with the grain, and afford the customer an opportunity to examine the cargo before delivery and acceptance. The defendant bought on the Chicago market a car load of oats for delivery to the plaintiff on an order for "fancy clip't seed oats." On said order, a car load of oats was shipped to the plaintiff at Pawling, where he received the same and stored the oats in his bins. He paid for the oats according to a bill rendered for "fcy. clip't seed oats." He sold to his various customers, farmers, for planting purposes, some 1,300 bushels of the cargo. It happened that the oats so sold to the farmers did not germinate when planted under ordinary conditions, and he was obliged to make good to his customers the moneys they had paid for the oats, and, as he claimed,

he incurred obligations to said customers for their expenses in plowing and reseeding their lands.

He brought this action to recover his losses, on the ground that the defendant had warranted that the oats in question were suitable for planting purposes and could and would germinate under ordinary conditions of soil and culture. On the trial, the court held that there was no express warranty, and the case was submitted to the jury on the theory of an implied warranty that the oats were suitable for planting purposes. The defendant gave proofs that in the trade there were well known and simple processes for testing the germinating powers of the oats; but the plaintiff testified that he was ignorant of these processes, and had been informed by Merriam, after the oats had been received by him, that they had already been tested, and that therefore he made no tests himself before selling the oats to his customers. The defendant had never seen the oats in question, nor had them in its actual possession, except as they were in transitu. They had been selected and shipped at Chicago as "fancy clip't seed oats," according to the usual methods of the general grain business. The proofs were that the words "seed oats" were descriptive of large or heavy berries which had been cleaned of chaff and foreign seeds, to fit them for planting. The plaintiff produced evidence to show that these oats had been "purified"—that is, treated by fumes of sulphur to such an extent as to impair or destroy their power of germination; but whatever such treatment had been used was not done by or known to the defendant, and must have been done, if at all, before the defendant bought the oats at Chicago for delivery to the plaintiff. The primary question involved in this appeal is whether, under these circumstances, the law will charge the defendant with an implied warranty that these oats were suitable for ordinary planting purposes. The defect in the oats was latent. It was due to causes unknown to the defendant. The oats delivered were selected as "seed oats," and answered generally to the description of such; but their quality for planting purposes was inferior, according to the plaintiff's claim.

[1] The general rule as to an implied warranty in the sale of goods is that, unless the vendor is the producer or manufacturer of the articles, there is no implied warranty against latent defects, even if the vendor knows the purposes for which the goods are bought. Bartlett v. Hoppock, 34 N. Y. 118, 88 Am. Dec. 428; Dounce v. Dow, 64 N. Y. 411; American Forcite Powder Mfg. Co. v. Brady, 4 App. Div. 95, 38 N. Y. Supp. 545; Cafre v. Lockwood, 22 App. Div. 11, 47 N. Y. Supp. 916; Reynolds v. Mayor, Lane & Co., 39 App. Div. 218, 57 N. Y. Supp. 106; Carleton v. Lombard, Ayres & Co., 149 N. Y. 137, 43 N. E. 422. There are several authorities in this state relative to the question of an implied warranty in the sale of seeds; but all of these, so far as an implied warranty as to the quality of the seeds was declared, relate to cases where the sale of the seeds was made by the growers thereof, and not by middlemen in the ordinary course of business. White v. Miller, 71 N. Y. 118, 27 Am. Rep. 13; Landreth v. Wyckoff, 67 App. Div. 145, 73 N. Y. Supp. 388; Prentice v. Fargo, 53 App. Div. 608, 65 N. Y. Supp. 1114.

[2] There is, of course, an implied warranty on the part of every seller, whether manufacturer or not, to the extent that the article sold is identical with the article bought, as was held in Hawkins v. Pemberton, 51 N. Y. 198, 10 Am. Rep. 595, where one who sold an article as "blue vitriol," which was in fact not "blue vitriol," but a substance known as "saltzburger," or mixed vitriol, and which contained but a small portion of blue vitriol, was held liable on a breach of implied warranty as to identity, but not as to quality. In Allan v. Lake, 18 A. & E. (N. S.) 560, one who had sold turnip seed as "Skirving's Swedes" was held for a breach of an implied warranty, on proof that the seed sold was not "Skirving's Swedes." A similar case is that of Van Wyck v. Allen, 69 N. Y. 61, 25 Am. Rep. 136, where one who had sold cabbage seed as "Van Wycklin's Flat Dutch, raised at New Lots, Long Island," was held liable for a breach of implied warranty, on proof that the seed delivered was not "Van Wycklin's Flat Dutch," which was a well known and specially valuable brand of cabbage seed; but here again the breach was as to an implied warranty of identity between the thing sold and delivered and the thing bought.

The most recent authority on this point is Depew v. Peck Hardware Co., 121 App. Div. 28, 105 N. Y. Supp. 390. There a farmer bought seed as pure alfalfa seed. After it was planted, it turned out that the seed was mostly trefoil and dodder, both useless weeds, with but a very small mixture of alfalfa. The seller was held liable for breach of an implied contract because the seed was not alfalfa—even impure alfalfa, although there was a small proportion of the latter present. The court, however, was careful to point out that:

"If the alfalfa seed had been defective, not up to the standard in quality, there would have been no implied warranty."

[3] There the seller was not the producer of the seeds, but a mere middleman. Now, in the case at bar, the defendant was a middleman. It did not raise the oats, nor was it in the business of selling seeds for planting purposes. It had no knowledge, actual or constructive, of any latent defects in the oats in question. It did deliver oats of the general description of "seed oats," and if there was any defect in them it was in their quality of germinating power, and not as to their identity as "fancy clip't seed oats."

The judgment and order should be reversed, and a new trial granted; costs to abide the event. All concur.