## REYNOLDS *v.* PALMER.

*(Circuit Court, W. D. North Carolina.* April Term, 1884.)

1. CONTRACT—ACTIONS IN CONTRACT AND TORT—JOINDER OF CAUSES.

Under the Code of North Carolina causes of action in tort and contract may be joined in the same case, provided they arise out of transactions connected with the same subject-matter, and affecting the same parties.

2. SAME—DECEIT IN BUSINESS TRANSACTIONS.

Deceit in business transactions consists in fraudulent representations or contrivances by which one man deceives another who has a right to rely upon representations, and has no means of detecting the fraud.

3. SAME—SALE OF GOODS—FRAUDULENT REPRESENTATIONS AS BASIS FOR SUIT AT LAW.

Fraudulent representations in the sale of goods will not of themselves constitute deceit, which will be the subject of a suit for damages. Mere "dealing talk," unless accompanied with some artifice to deceive the purchaser, or throw him off his guard, or some concealment of intrinsic defects not easily detected by ordinary care and diligence, does not entitle one to an action.

4. SAME—NEGLECT OF PURCHASER TO INSPECT GOODS.

A party cannot be relieved by law, who, having every opportunity allowed him to inspect goods for himself, neglects to do so, but takes the goods at the estimate put on them by the seller.

5. SAME—SALE BY SAMPLE—IMPLIED WARRANTY.

To constitute a sale by sample with warranty implied, it must appear that the parties contracted solely with reference to the sample, and mutually understood that they were so dealing with the quality of the bulk.

6. SAME—IMPLIED WARRANTY GENERALLY.

It is generally understood that in the sale or exchange of goods a warranty as to quality is not implied in law. The law presumes that a party who distrusts his own judgment and shrewdness will protect himself by requiring an express warranty.

7. SAME—"SOUND ORDER" IN CONTRACT FOR SALE OF TOBACCO.

The words "sound order," as applied in a contract relating to tobacco to be delivered to a manufacturer, means such order as would, with ordinary care, insure the sound condition of the tobacco at the time of its arrival at the place where it is to be manufactured, and for a reasonable time thereafter, until it could be used in the course of manufacture.

8. SAME—ONE PARTY CANNOT RESCIND CONTRACT IN PART.

A party entering into a contract for the purchase of goods to be sent in two consignments, cannot accept, pay for, and use the the first consignment, and refuse the second, and rescind the contract, without the consent of the seller.

9. SAME—WRITTEN CONTRACT PRESUMED TO EMBRACE PREVIOUS ORAL ONE.

It is a rule of law that all previous stipulations between parties to a transaction are presumed to be embraced in a subsequent written contract about the same subject-matter.

10. SAME—RIGHT OF ACTION NOT WAIVED BY ACCEPTANCE OF GOODS.

A party who accepts and uses a commodity, notwithstanding the fact of its being other than it was represented to be, does not thereby waive his right of action, but is entitled to recover for the breach of warranty the difference between the values of the goods in their damaged and undamaged condition.

At Law.

*C. B. Watson, J. T. Morehead,* and *J. H. Dillard,* for plaintiff.

*John N. Staples* and *J. C. Buxton,* for defendant.

DICK, J., *(charging jury.)* This is an important case to the parties on account of the amount of money involved. It is an interesting one to the persons who have heard the trial, as the evidence and the

legal questions presented are connected with the cultivation, curing, handling, the preparation for market, the sale, and manufacture of tobacco, a very important staple commodity in this section of country. The plaintiff brought this action to recover damages which he alleges he has sustained in a transaction in regard to the sale and delivery of a large crop of tobacco. In the pleadings he presents several causes of action. Under the flexible and liberal system of pleading and procedure adopted in the Code of this state, actions on *contract* and *tort* may be united in the same case, provided they arise out of transactions connected with the same subject-matter, and affect only the same parties.

The plaintiff alleges that he has sustained damages by reason of a deceit on the part of the defendants, in that the tobacco was "frost-bitten," and assurances were made to the contrary before the sale; that inferior grades of tobacco were designedly placed in the upper part of the barns, where they could not be easily seen, and fraudulent representations as to quality were made, well calculated to deceive. Deceit in business transactions consists in fraudulent representations or contrivances by which one man deceives another who has a right to rely upon representations, or has no means of detecting such fraud. Fraudulent representations in the sale of goods will not of themselves always constitute deceit which will be the subject of an action for damages. In cases like this, where parties deal with each other on a footing of equality, there must be some existing circumstances, or some means used, calculated to prevent the detection of falsehood or fraud, and impose upon a purchaser of ordinary prudence and circumspection. If a purchaser has full opportunity of examining the goods, and can easily and readily ascertain their quality and value by inspection, and he neglects to do so, then any injury which he may sustain by such negligence is the result of his own folly, and he can have no relief at law. The evidence on both sides shows that the plaintiff visited the barns before the sale, saw the tobacco, and, with some little inconvenience, could have made full examination, and no obstructions were placed in his way, and no objections were made by the agent of the defendant. A written contract was afterwards entered into by the parties, the terms of which had no reference to the representations made as to the quality or condition of the tobacco in previous negotiations. I am of opinion that this cause of action for deceit cannot be sustained, and the issue upon that subject is withdrawn from your further consideration.

The plaintiff further says that, when he visited the barns, he found the tobacco in three barns so much crowded and in such dry condition that he could not make an examination without serious injury to the commodity. He carefully inspected the tobacco on the lower tiers of the barns, and was assured by the agent that it fairly represented the quality of the whole crop, and trusting to such assurances he made no request for further examination. Under these circumstances, the plaintiff insists that the subsequent sale may be regarded

as a *sale by sample*, and that the law implies a warranty as to the quality of the entire crop. A sale by sample is where a small quantity of any commodity is exhibited by the vendor as a fair specimen of a larger quantity, called the bulk, which is not present, and there is no opportunity for a personal examination. To constitute such sale, it must appear that the parties contracted solely with reference to the sample, and mutually understood that they were so dealing in regard to the quality of the bulk. Such sales are commonly made when it is not convenient for the purchaser to see the bulk of the commodity, and one of the main reasons why the law implies a warranty is because there is not an opportunty for a personal examination of the article which the sample is shown to represent. It is conceded that, when the plaintiff proposed to purchase, the defendant offered him the means of reaching the barns, which were three miles distant, and told him that the agent would give him information and facilities for personal examination. A thorough examination was not made on account of the condition of the tobacco in the barns, as stated by the plaintiff in his testimony. At that time the tobacco was the property of the defendant, and any injury produced would have been his loss, and he made no objection to a full examination, and furnished facilities for such purpose. It is well established as a general principle that, on the sale or exchange of goods, a warranty as to the quality is not implied in law. There are some exceptions to this general rule, but it is unnecessary for me to refer to them, as the evidence does not bring this case within any of such exceptions. In most sales the law wisely and justly presumes that a purchaser will take care of his own interests, and that, when he distrusts his own shrewdness and judgment, he will protect himself from imposition by requiring an express warranty. In all cases where he has an opportunity of inspecting the goods, and fails to do so, he cannot properly complain if the goods do not come up to his own expectations, and the representations of the vendor. If an opportunity is afforded by the vendor, and an inspection is practicable, it must be made by the purchaser, no matter how disagreeable and inconvenient it may be. It is well known that, in the course of trade, vendors will speak in terms of high commendation of the commodities which they offer for sale. Such "dealing talk" is not regarded in law as fraudulent, unless accompanied with some artifice to deceive the purchaser and throw him off of his guard, or some concealment of intrinsic defects not easily discoverable by reasonable care and diligence. If a purchaser has an opportunity of seeing and examining for himself, he should rely upon his own judgment, and accept the consequences of mistake; or he should protect himself by express warranty.

As I am of opinion, from the evidence on both sides, that none of the elements of an implied warranty arise in this case, I will withdraw this issue from your further consideration. It is therefore unnecessary for me to consider the question presented in the argument

of counsel of defendant, whether the contract of sale subsequently made in writing and containing no warranty as to quality, and having an express warranty as to the condition of the tobacco at the time of delivery, can be enlarged or varied by parol evidence of previous declarations and circumstances.   The general rule of law was correctly stated by counsel, that all previous stipulations between parties to a transaction are presumed to be embraced in a subsequent written contract about the subject-matter.   There are some apparent exceptions to this rule, where it is manifest that it was not the intention of the parties to a written contract to include all the terms of a previous parol contract about the same subject-matter.   Such questions, although learnedly discussed in the argument, are not now involved in the case, as they applied to the issue which I have withdrawn from your consideration.

The only issue submitted for your determination is whether there was a breach of the express warranty contained in the written contract between the parties as to the "sound order" of the tobacco at the time of delivery at Saltville, and, if there was such breach, what are the damages which the plaintiff is entitled to recover?   The counsel of plaintiff, in the concluding argument, insists that the counsel of defendant, who preceded him, admitted that there was such a breach. I did not so understand the defendant's counsel.   He only expressed an opinion as to the weight of evidence.   That evidence you must weigh and consider for yourselves in determining the rights of parties.   It is admitted that the tobacco was delivered in a reasonable time at Saltville to the railroad agent, and was duly shipped, and reached its destination at Winston in eight or ten days.   There is no evidence as to the state of the weather during the transportation, or in what manner the tobacco was carried by the railroad company,— whether upon open platform or in closed box cars.   There is some evidence tending to show that the hogsheads containing the tobacco exhibited no marks or appearances of injury by exposure to the weather.   There is no warranty in the written contract as to the quality of the tobacco, and if the defendant delivered the tobacco as it was when purchased, and delivered it in *sound order*, then he complied with his agreement.   If more of the tobacco was of an inferior quality than was expected by the plaintiff, and some of it was "frost-bitten," that would not constitute a breach of warranty, as that condition of things existed before the sale, and the plaintiff might have discovered such defects by careful examination.

The written contract of sale contains an express warranty as to the condition in which the tobacco was to be packed in hogsheads at the time of delivery at Saltville.   It was to be in "sound order;" and we will now proceed to construe the meaning of that term as used by the parties.   It is a fundamental rule that in the construction of contracts the courts may look not only at the language employed, but to the subject-matter and the surrounding circumstances,

and may avail themselves of the same lights which the parties possessed when the contract was made. Previous and contemporary transactions and facts may be very properly taken into consideration to ascertain the nature of the subject-matter of a contract, and the sense in which parties may have used particular terms, but not to alter or modify the plain language which they have used. In construing the term "sound order," as used in the contract, we must ascertain the intention of the parties by considering their purposes and objects as manifested by the acts, declarations, and circumstances accompanying the transaction. The tobacco was purchased by the plaintiff for the purpose of manufacture at Winston, a place at considerable distance from the place of delivery. It was to be transported by railway, and the "working season" would be fully open by the first of May. The plaintiff gave instructions to pack, as soon as convenient, in "good, sound keeping order, so that the wrappers would not be broken." Under such circumstances, I think "sound order" means such order as would, with ordinary care, insure the sound condition of the tobacco on its arrival at Winston, and for a reasonable time thereafter, when it could be used in the course of manufacture. The warranty did not require the tobacco to be so packed as to remain sound for a long period, as long storage was not the purpose contemplated. With this construction of the contract, you will now proceed to consider the evidence upon the subject.

The witnesses of the defendant, who were engaged in the purchasing and delivery of the tobacco, states directly and positively that it was purchased and delivered *in good, sound keeping order* at Saltville, in accordance with the instructions of the plaintiff. The witnesses of the plaintiff did not see the tobacco when it was purchased and delivered, but they profess to be *experts* in the packing, shipping, and manufacturing of such articles, and have acquired their information and skill by long and large experience. They saw the tobacco soon after it reached Winston, and say positively that its damaged condition at that time was produced by negligence, ignorance, or a want of skill in packing in the hogsheads. You have before you the direct and positive testimony of the defendant's witnesses, and the well-considered opinions of the plaintiff's witnesses, founded upon knowledge acquired by long experience. You will therefore carefully weigh the direct testimony offered by the defendant, and the strong presumptive evidence presented by the plaintiff, and decide as to which preponderates in the scale of inquiry.

The evidence shows that there were two shipments of the tobacco: one on the seventh of April, 1882; the other on the twentieth of May, 1882. The contract price of the tobacco was 24 cents per pound, to be paid on delivery at Saltville. The price was not paid on delivery, but the defendants, by shipping before payment, waived this failure of compliance with the contract. The price of the first payment was paid by plaintiff before the tobacco arrived in Winston. There is no

representation as to the general quality of the tobacco in the contract; the express warranty only extends to the condition in which the tobacco was to be when delivered. The plaintiff, upon ascertaining the damaged condition of the tobacco, might have given notice to the defendant that he would not accept the same, but would hold as a security for the purchase money advanced. Such receiving and holding would not have been an acceptance. The plaintiff would have been a bailee holding under a lien, and would be required to exercise only ordinary care to prevent further damage. As the plaintiff accepted and used this first shipment of tobacco, he is only entitled to recover for the breach of the warranty the difference between the value of the tobacco in a sound condition in Saltville, and the value at Winston in its damaged condition. By accepting the tobacco he did not waive his right to sue for a breach of the warranty. He had paid for the tobacco and he had a right to "make the most of it,"—to secure himself as far as possible for the payments which he had made. As the contract of sale was an entire contract for the whole crop of defendant, and the first shipment was accepted, paid for, and used, the plaintiff had no right to refuse acceptance of the second shipment and rescind the contract without the consent of the defendant. If a contract is rescinded, it must be rescinded as to the whole subject-matter, and the parties placed in the condition they occupied before the contract became partly executed. When the second shipment was delivered to the railroad agent at Saltville, it became the property of the plaintiff, and he had no right to refuse its acceptance in Winston, although it was found to be in a damaged condition. If the tobacco was injured by the defective packing, the plaintiff's only remedy is an action for the damages sustained by a breach of warranty. He is liable to the defendant for the cost price which was not paid, and the defendant is liable to him by way of damages for the difference between the value of the tobacco sound and the tobacco injured. There is no direct evidence as to the value of the tobacco in sound condition at Saltville, as there was no market for such commodities at that place. The cost price agreed upon by the parties may well be considered as a *prima facie* standard of value. It may be that the plaintiff agreed to pay too much, or he may have obtained it at less than its real value. There is some evidence as to the value of such tobacco in the markets of the country, and you may thus ascertain its market value by deducting the cost of transportation to such place of sale. If you find that there was a breach of warranty as to soundness, then you will ascertain the value of tobacco when sound, deduct the value of the injured tobacco at Winston, then deduct the cost price of the second shipment, which was not paid, and render a verdict in favor of plaintiff for balance, if any.

The instructions which I have given you include the rights of the defendant as presented in his counter-claim. If the tobacco was in sound condition at the time of delivery at Saltville, he is entitled to

recover the balance of contract price, which is unpaid. He is in no way responsible for damages to the tobacco caused by exposure, or any other negligence of the railroad company in the course of transportation. He is only liable for damages caused by his own negligence, or want of skill in packing the tobacco in the hogsheads. You will consider the cause of action set forth by the plaintiff in his complaint, and the claim of the defendant set up in his counter-claim, and adjust and determine the controversy in accordance with the preponderance of the evidence, and the principles of law which the court has stated to you.

Verdict for plaintiff.

---

§ 1. WARRANTY DEFINED—EXPRESS AND IMPLIED. "A warranty," said Lord ABINGER, C. B., in *Chanter* v. *Hopkins*,[1] "is an express or implied statement of something which the party undertakes shall be a part of a contract; and, though part of the contract, yet collateral to the express object of it." The best definition of a warranty, said MARTIN, B., in *Stucley* v. *Baily*, is that given by Lord ABINGER in *Chanter* v. *Hopkins;* and the text writers have almost unanimously adopted the definition of the chief baron with the indorsement of Baron MARTIN. The frequent case of express warranties on the sale of goods and chattels—that the article is of a certain quality, of a certain quantity, of a certain kind—is beyond the scope of this note, which is confined to the cases where the law *implies* from the circumstances of the sale itself a warranty of quality, quantity, or title, as the case may be.

Implied warranties may be divided for convenience into the following:

I. The implied warranty of identity or genuineness.

II. The implied warranty on a sale of goods by description that the article is merchantable.

III. The implied warranty on a sale by sample that the goods correspond to the sample.

IV. The implied warranty that the goods shall be fit for the buyer's purpose.

V. The implied warranty of title.

VI. The implied warranty from custom.

§ 2. EXISTENCE OF ARTICLE NOT A WARRANTY, BUT AN ESSENTIAL ELEMENT OF THE CONTRACT. That the article sold actually exists is not an implied warranty, but is an essential element of the sale itself, without which there is no contract between the parties at all. Thus, in *Terry* v. *Bissell*,[2] the defendants sold the plaintiff a note, not then due, purporting to be signed by A. and indorsed by B. The signature of A. was genuine, but the indorsement by B. was a forgery. There was no express warranty of the genuineness of the indorsement, and neither party had any suspicion that it was forged. After the note had been protested for non-payment, the plaintiff discovered the fact of the forgery, and immediately offered to return the note to the defendants, and demanded the money paid for it. The defendants refusing to receive the note or refund the money, he brought an action of *assumpsit* for money had and received. It was held that he was entitled to recover. "In the first place," said ELLSWORTH, J., "there was no sale, because

---

[1] 4 Mees. & W. 404.　　　　　　　　　[2] 26 Conn. 23.

the subject-matter of the sale had no existence." There must be, in order to make a valid contract, a thing sold. If, ignorant of the death of my horse, I sell it, there is no sale, for want of a thing sold. If A. and B., being together in New York, A. sells B. his house in Chicago, both being ignorant that it has been burned down, the contract is null, for there is nothing to contract about.[1] "I have often ruled," said Lord KENYON in *Farrar* v. *Nightingale*,[2] "that where a person sells an interest, and it appears that the interest which he pretended to sell was not the true one,—as, for example, if it was for a lesser number of years than he had contracted to sell,—the buyer may consider the contract as at an end, and bring an action for money had and received, to recover back any sum of money he may have paid." There are intimations to be found occasionally to the effect that there is an implied warranty of the existence of the thing sold; but this is a mistaken idea, as a proper conception of the contract of sale will show, and as the cases just referred to sufficiently demonstrate.

§ 3. IDENTITY OF GOODS—NOT A WARRANTY. The same is true of the matter of the identity of the goods. "If a man," said Lord ABINGER in *Chanter* v. *Hopkins*,[3] "if a man offers to buy peas of another, and he sends him beans, he does not perform his contract; but that is not a warranty; there is no warranty that he should sell him peas; the contract is to sell peas, and if he sells him anything else in their stead, it is a non-performance of it. So, if a man were to order copper for sheathing ships, that is a particular copper, prepared in a particular manner; if the seller sells him a different sort, in that case he does not comply with the contract; and though this may have been considered a warranty, and may have ranged under the class of cases relating to warranties, yet it is not properly so." And in *Terry* v. *Bissell*,[4] ELLSWORTH, J., said: "Suppose the defendant had proposed to sell and had sold a bar of metal as gold which turned out to be mere dross, colored and disguised, without a particle of gold; or a barrel of flour, which was examined on the surface, but below was mere sawdust or gravel; or a barrel of beef, which turned out to have one layer of beef and the rest was brickbats and stones; or a box of chisels, which turned out to be scrap-iron,—would the seller be permitted to insist that it was a sale, and keep his money?"

§ 4. THE GENERAL RULE ON A SALE IS CAVEAT EMPTOR. Centuries ago, Fitzherbert[5] laid down the common law of buying and selling thus: "If a man do sell unto another man a horse, and warrant him to be sound and good, etc., if the horse be lame or diseased that he cannot walk, he shall have an action on the case against him. And so, if a man bargain and sell with another certain pipes of wine and warrant them to be good, etc., and they are corrupted, he shall have an action on the case against him. But note, it behoveth that he warrant it to be good, and the horse to be sound, otherwise the action will not lie; for if he sell the wine or horse without such warranty, it is at the other's peril, and his eyes and his taste ought to be his judges in the case." This is the doctrine of *caveat emptor*—let the purchaser take heed. Under this rule, where the sale of a chattel takes place which has been or might have been inspected by the buyer at the sale, there is no implied warranty on the part of the seller as to the quality or condition of the thing sold, but all risks as to them fall upon the buyer. This rule is well established in England, and in the courts of all the states, with a single exception.[6] And

[1] Poth. Cont. 4.
[2] 2 Esp. 639.
[3] Ante.
[4] Supra.
[5] Nat. Br. 213.
[6] Jones v. Just, L. R. 3 Q. B. 202; Chandelor v. Lofus, Cro. Jac. 4; Parkinson v. Lee, 2 East, 314; Springwell v. Allen, Aleyn, 91; Hopkins v. Tanqueray, 15 C. B. 130; Hall v. Condor, 2 C. B. (N. S.) 22; Ormrod v. Huth, 14 Mees. & W. 664; Burnbey v. Bollett, 16 Mees. & W. 644; Mixer v. Coburn, 11 Metc. 559; Windsor v. Lombard, 18 Pick. 60; Barnard v. Kel-

the fact that the merchandise is packed up, is no excuse for the purchaser not examining it. That paint was sold in kegs;[1] that crockery was sold in crates;[2] that flour was sold in barrels;[3] that hemp was sold in bales;[4] that tobacco was sold in kegs;[5] that molasses was sold in barrels,[6]—was held in each case to be no reason why the purchaser should not have examined them. In the latter case the court say: "If it should be held a sufficient excuse for the neglect to make the examination that the molasses was in barrels, such an excuse would be equally available in all cases where the article sold is in any kind of inclosure, however readily the vessels or envelopes might be opened. In fact, it would be available in almost every case where the purchaser should not choose to examine the goods he is contracting for."

§ 5. WARRANTY ON SALE OF GOODS BY DESCRIPTION THAT THEY ARE MERCHANTABLE—THE PRINCIPLE STATED. "If a man sells an article," says BEST, C. J., in *Jones* v. *Bright*,[7] "he thereby warrants that it is merchantable; that is, that it is fit for some purpose. If he sells it for a particular purpose he thereby warrants it to be fit for that purpose, and no case has been decided otherwise, although there are, doubtless, some *dicta* to the contrary."

"Under such circumstances," said Lord ELLENBOROUGH in *Gardiner* v. *Gray*,[8] "(the sale of goods as 'waste silk,') the purchaser has a right to expect a salable article answering the description in the contract. Without any particular warranty this is an implied term in every such contract. Where there is no opportunity to inspect the commodity the maxim of *caveat emptor* does not apply. He cannot without a warranty insist that it shall be of any particular quality or fineness, but the intention of both parties must be taken to be that it shall be salable in the market under the denomination mentioned in the contract between them. The purchaser cannot be supposed to buy goods to lay them on a dunghill."

In *McClung* v. *Kelly*[9] it was said: "The contract always carries with it an obligation that the article shall be merchantable; at least, not to have any remarkable defect."

In *Gaylord Manuf'g Co.* v. *Allen*[10] it was said: "A contract to manufacture and deliver an article at a future day carries with it an obligation that the article shall be merchantable; or, if sold for a particular purpose, that it shall be suitable and proper for such purpose."

In *Edwards* v. *Hathaway*,[11] SHARSWOOD, J., said: "The general rule at law is that, upon the sale of any article of merchandise, the seller does not become responsible for the quality of the article sold, unless he either expressly warranted the quality, or made a false and fraudulent representation in regard to it. This rule, however, is subject to some reasonable exceptions. It does not apply where the purchaser has no opportunity of inspecting the article. * * * I take it the same modification of the general rule applies when a coal dealer gives an order to the agent for coal to be sent to him from the mine; it is an implied term of the contract that the coal shall be of a merchant-

logg, 10 Wall. 383; Salem Rubber Co. v. Adams, 23 Pick. 256; Bryant v. Pender, 45 Vt. 487; Holden v. Dakon, 4 Johns. 421; Carley v. Wilkens, 6 Barb. 557; Seixas v. Woods, 2 Caines, 48; Moses v. Mead, 1 Denio, 378; Wilbur v. Cartwright, 44 Barb. 536: Dean v. Mason, 4 Conn. 428; Frazier v. Harvey, 34 Conn. 469; Hahn v. Doolittle, 18 Wis. 196; Westmorland v. Dixon, 4 Hayw. (Tenn ) 233; Otts v. Alderson, 10 Smedes & M. 473; Tewksbury v. Bennett, 31 Iowa, 83; Hadley v. Clinton, 13 Ohio St. 502; Irving v. Thomas, 18 Me. 418; Johnston v. Cope, 3 Har. & J. 89. Contra,

Timrod v. Shoolbred, 1 Bay, 324; Barnard v Yates, 1 Nott & McC. 142, where caveat venditor is the rule.
[1] Holden v. Dakin, 4 Johns. 421.
[2] Thompson v. Ashton, 14 Johns. 316.
[3] Hart v. Wright, 17 Wend. 267.
[4] Salisbury v. Stainer, 19 Wend. 159.
[5] Hyatt v. Boyle, 5 Gill & J. 110.
[6] Humphreys v. Comline, 8 Blackf. 516.
[7] 5 Bing. 544.
[8] 4 Camp. 144.
[9] 21 Iowa, 509.
[10] 53 N. Y. 518.
[11] 1 Phila. 547.

able character. It would not be allowed in such a case that the seller should, in compliance with such an order, send an article which, though it might still pass muster by the name of coal, was composed of one-half slate or stone. It would be different if a man went into a coal-yard and purchased a quantity of coal there lying. His eyes in such a case are his market, and if he distrusts his own judgment he should take the opinion of those who are acquainted with the article, or require the seller to warrant. But a man's eyes are of no use to him when he is buying something in the bowels of the earth fifty or a hundred miles distant."

In *Rodgers* v. *Niles*,[1] SCOTT, J., said: "It must be clear that the rule of *caveat emptor* can apply in no such case, whether the contract be made with a manufacturer or other person; for the person can exercise no judgment in regard to the quality of a thing not *in esse*, or which is undeterminate, and to be thereafter selected or procured by the exercise of the vendor's sole judgment, discretion, and will. Any rule must be unreasonable which would impute to a purchaser an intention to rely on his own judgment as to the quality of an article where the circumstances of the case render it simply impossible for him to exercise any judgment whatever."

§ 6. SAME — THE CASES REVIEWED. There was a contract for the sale of 12 bales of waste silk imported from the continent into England. Before it was landed, samples were shown to the plaintiff's agent, and the bargain was then made, but without reference to the samples. It was purchased in London and sent to Manchester, and on its arrival there was found to be of a quality not salable under the denomination of "waste silk." It was held that there was an implied warranty that the article was salable, and the plaintiff had a verdict.[2]

A firm of Liverpool merchants agreed to buy from the defendant, a London merchant, a quantity of Manilla hemp, to arrive from Singapore by certain ships. The ships arrived, and the hemp was delivered to the plaintiffs and paid for, but on examination of the bales it was found that they had been wetted through with salt water, and afterwards unpacked and dried, and then repacked and shipped at Singapore. The hemp was not damaged to such an extent as to lose its character of hemp, but it was not merchantable. The defendant did not know of the state in which the hemp had been shipped at Singapore. The Liverpool merchants sold the hemp at auction as "Manilla hemp, with all faults," and it realized 75 per cent. of the price which similar hemp would have brought if undamaged. In an action by the Liverpool merchants it was held that there was an implied warranty on the part of the defendant to supply Manilla hemp of the particular quality of which the bales consisted, in a merchantable condition; and that the plaintiffs were entitled as damages to the difference between what the hemp was worth when it arrived, and what the same hemp would have realized had it been shipped in a state in which it had ought to have been shipped.[3]

E, was the proprietor of a coal mine in the country, and his agent sold to H. 55 tons of coal to be taken from E.'s mine. The coal arrived, but was found to be composed to a considerable extent of slate and stone. It was held that there was an implied warranty on the part of the seller that the coal should be good merchantable coal.[4]

A contract was for "Calcutta linseed." JERVIS, C. J., told the jury that the question for them to consider was "whether there was such an admixture of foreign substances in it as to alter the distinctive character of the article, and prevent it from answering the description of it in the contract." CRESSWELL, J., said "they were to say whether the article delivered reasonably

[1] 11 Ohio St. 55.
[2] Gardiner v. Grey, 4 Camp. 144.
[3] Jones v. Just, L. R. 3 Q. B. 197.
[4] Edwards v. Hathaway, 1 Phila. 547; and see Spurr v. Albert Mining Co. 2 Hannay, (N. B.) 361.

answered the description of Calcutta linseed." CROWDER, J., said "the jury in effect found that the article delivered did not reasonably answer the description in the contract." And WILLES, J., added: "The purchaser had a right to expect, not a perfect article, but an article which would be salable in the market as Calcutta linseed. If he got an article so adulterated as not reasonably to answer that description, he did not get what he bargained for." [1]

In another case the contract was for "foreign refined rape oil, warranted equal to samples." The oil offered was equal to samples, but both the samples and the oil offered were adulterated. PARKE, B., told the jury that "the statement in the sold note as to the samples related to the quality only of the article, and that, according to the contract, the defendant was entitled to have rape oil delivered to him." PLATT, B., on appeal, said: "I understand that the oil to be delivered was to be equal to the samples in quality. But the defendant did not refuse to accept the oil tendered to him on the ground that it did not equal the samples, but on account of its not being foreign refined rape oil at all. And the learned judge told the jury that if they should think that was so, the defendant was not bound to accept it. That direction was perfectly correct. If the jury had found that the article which the plaintiff tendered was known in the market under the name and description of foreign refined rape oil, the plaintiff would have been entitled to succeed; but the question was put to the jury, and they were of the opinion that it was not known as such." And PARKE, B., added: "The evidence went to show that the oil offered did not answer the description of the article sold." [2]

In another case the article sold was "oxalic acid." ERLE, C. J., told the jury that "the defendant could only fulfill his part of the contract by delivering that which in commercial language might properly be said to come under the denomination of oxalic acid; and that, if they should be of opinion that the article delivered by the defendant as oxalic acid did not properly fulfill that description, they should find for the plaintiff."

In another case the plaintiffs ordered of the defendants, who were saddle manufacturers in another city, 50 saddles, to be delivered at a wharf in London, to be shipped to Prince Edward's island. The saddles were sent and shipped without the plaintiffs having an opportunity to see them. Upon their arrival at Prince Edward's island, they were found to be very inferior saddles and quite unsalable without being restuffed and relined. It was held that there was an implied undertaking that the saddles were merchantable, and the plaintiffs had a verdict. [3]

§ 7. WARRANTY ON SALE OF GOODS FOR SPECIFIED PURPOSE—THE PRINCIPLE STATED. "If a man," said BEST, C. J., in *Jones* v. *Bright*, [4] "sells an article, he thereby warrants that it is merchantable; that is, fit for some purpose. If he sells it for a particular purpose, he thereby warrants it fit for that purpose. * * * Whether or not an article has been sold for a particular purpose is, indeed, a question of fact; but if sold for such purpose, the sale is an undertaking that it is fit. * * * The law then resolves into this: that if a man sells generally, he undertakes that the article sold is fit for some purpose; if he sells it for a particular purpose, he undertakes that it shall be fit for that particular purpose."

In *Gray* v. *Cox*, [5] ABBOTT, C. J., said: "If a person sells a commodity for a particular purpose, he must be understood to warrant it reasonably fit and proper for such purpose."

In *Brown* v *Edgington*, [6] TINDAL, C. J., said: "It appears to me to be a distinction well founded, both in reason and on authority, that if a party purchase an article upon his own judgment, he cannot afterwards hold the vendor

[1] Wieler v. Schilizzi, 17 C. B. 619.
[2] Nichol v. Godts, 10 Esp. 191.
[3] Laing v. Fidgeon, 4 Camp. 169.
[4] 5 Bing. 533.
[5] 4 Barn. & C. 108.
[6] 2 Maule & S. 279.

responsible, on the ground that the article turns out unfit for the purpose for which it was required; but if he relies upon the judgment of the seller, and informs him of the use to which the article is to be applied, it seems to me the transaction carries with it an implied warranty that the thing furnished shall be fit and proper for the purpose for which it is designed."

In *Randall* v. *Newson*,[1] BRETT, L. J., said: "In some contracts, the undertaking of the seller is said to be only that the article shall be merchantable; in others, that it shall be reasonably fit for the purpose to which it is to be applied. In all, it seems to us it is either assumed or expressly stated that the fundamental undertaking is that the article offered or delivered shall answer the description of it contained in the contract. That rule comprises all the others; they are adaptations of it to particular kinds of contracts of purchase and sale. You must therefore first determine, from the words used or the circumstances, what, in or according to the contract, is the real mercantile or business description of the thing which is the subject-matter of the bargain of purchase or sale, or, in other words, the contract. If that subject-matter be merely the commercial article or commodity, the undertaking is that the thing offered or delivered shall answer that description; that is to say, it must be that article or commodity, and reasonably fit for the particular purpose. The governing principle, therefore, is that the thing offered and delivered under a contract of purchase and sale must answer the description of it which is contained in the words in the contract, or which would be so contained if the contract were accurately drawn out. And if that be the governing principle, there is no place in it for the suggested limitation. If the article or commodity offered or delivered does not, in fact, answer the description of it in the contract, it does not do so, more or less, because the defect in it is patent or latent or discoverable. And, accordingly, there is no suggestion of any such limitation in any of the judgments in cases relating to contracts of purchase and sale."

In *Gerst* v. *Jones*,[2] STAPLES, J., said: "The maxim *caveat emptor* applies in the absence of fraud or express warranty. Several modifications of this rule have, however, been recognized by the courts, perhaps as well established as the rule itself. One of these is that upon an executory contract of sale, where goods are ordered for a particular use or purpose known to the seller, the latter impliedly undertakes they shall be reasonably fit for the use or purpose for which they are intended. Such a case, according to the authorities, is plainly distinguishable from that of an executed sale of a specific chattel selected by the purchaser upon which no implied warranty arises. The distinction seems to be somewhat refined and technical at first view, but it is founded in sound reason and is sustained by the authorities. Where the purchase is of a defined, ascertained article, the vendor performs his part of the contract by sending the article, and, in the absence of fraud or some positive affirmation amounting to a warranty, he is not liable for any defect in the quality. The purchaser in selecting the particular article relies upon his own judgment, and takes upon himself the risk of its answering his purposes. If he desires to secure himself against loss, he ought to require an express warranty. In the absence of such warranty the rule of *caveat emptor* must govern. Where, however, the purchaser does not designate any specific article, but orders goods of a particular quality or for a particular purpose, and that purpose is known to the seller, the presumption is the purchaser relies upon the judgment of the seller, and the latter, by undertaking to furnish the goods, impliedly undertakes they shall be reasonably fit for the purpose for which they are intended, and he will be answerable for any defect in the material or in the construction by which the value is diminished. This rule applies with peculiar force where the seller is the manufacturer."

[1] L. R. 2 Q. B. Div. 102.          [2] 32 Grat. 521.

§ 8. SAME—THE CASES REVIEWED. The plaintiff ordered and bought of the defendant, a coach-builder, a pole for his carriage. The pole broke in use, and the horses became frightened and were injured. In an action for the damage, the jury found that the pole was not reasonably fit for the carriage, but the defendant had not been guilty of any negligence. It was held that the plaintiff was entitled to recover for the value of the pole and the injury to the horses, the court laying down the principle that, on the sale of an article for a specific purpose, there is a warranty by the vendor that it is reasonably fit for that purpose, and that this warranty extends to latent, undiscoverable defects. "It is to be taken," said BRETT, J., "although nothing specific seems to have been said, that the order given and accepted was not merely for a pole in general, but for the supply of a pole for the plaintiff's carriage; and that the contract, therefore, was for the purchase and sale or supply of an article for a specific purpose. In other words, the subject-matter of the contract was not merely a pole, but a pole for the purchaser's carriage; or, to state the proposition in an equivalent form, the thing which would, if the contract was formally drawn up, be described in it as the subject-matter of it, was not merely a pole generally, but a pole to be purchased for a specific purpose; namely, to be used in the plaintiff's carriage. The question is, what, in such a contract, is the implied undertaking as to the sufficiency of the pole? Is it an absolute warranty that the pole shall be reasonably fit for the purpose, or is it only partially to that effect,—limited to defects which might be discovered by care and skill?" The court, as we have seen, decided this question in favor of the plaintiff's contention.[1]

In another case the plaintiffs had agreed to carry certain troops from England to Bombay for the East India Company, and the defendants entered into a contract with the plaintiffs to supply them with provisions, (troop stores,) "guarantied to pass survey of the East India officers." It was held that this express warranty did not exclude the implied warranty that the stores should be fit for the purpose for which they were intended; and that, the provisions being unsound and unwholesome, the defendants were liable. "Where a buyer," said COCKBURN, J., "buys a specific article, the maxim *caveat emptor* applies; but where the buyer orders goods to be supplied, and trusts to the judgment of the seller to select goods which shall be applicable to the purpose for which they are ordered, there is an implied warranty that they shall be reasonably fit for that purpose; and I see no reason why the same warranty should not be comprehended in a contract for the sale of provisions."[2] This case was followed in *Beer* v. *Walker*.[3] Here a wholesale provision dealer in London contracted with a retail merchant at Brighton to send him weekly a certain quantity of rabbits. It was held that in this contract there was an implied warranty by the wholesale dealer that the rabbits should be fit for human food when, in the ordinary course of transit, they should reach the retail dealer at Brighton, and until he had had a reasonable opportunity of disposing of them to his customers.

In a New York case the plaintiffs were manufacturers of steel in Pennsylvania; the defendants, who were known as the "Morris Ax & Tool Company," were manufacturers of axes in New York. The plaintiffs sold to the defendants 10 tons of steel. It was held that there was an implied warranty that the steel was of the kind fit for axes, and that the defendant's name was notice to the sellers of the use to which the steel was to be applied. Said MULLEN, P. J.: "If a thing be ordered of the manufacturer for a special purpose, and it be supplied and sold for that purpose, there is an implied warranty that it is fit for that purpose. The plaintiffs were manufacturers, and the defendants ordered the steel for the purpose of being made into axes."[4]

---

[1] Randall v. Newson, L. R. 2 Q. B. Div. 102.
[2] Bigge v. Parkinson, 7 Hurl. & N. 955.
[3] 46 L. J. C. P. 677.
[4] Park v. Morris Axe Co. 4 Lans. 103.

In another New York case the plaintiff was a dealer in lamp-black; the defendant, a manufacturer of printer's ink. The plaintiff sold several barrels of lamp-black to the defendant, the latter saying that he must be very particular in having black that would make printer's ink; that black for carriage use would not do. The barrels were not examined. It was held that there was an implied warranty that the black should be suitable for the manufacture of printer's ink.[1]

The plaintiff bought a quantity of hay of the defendant in his barn, but did not examine it, saying that he could not tell by that, but he wanted hay for his oxen during spring and summer. The defendant replied that it was good hay, cut round the barn. When the plaintiff came to receive the hay he found it worthless, and not such hay as grew around the barn. It was held that he could recover on the implied warranty. "The hay," said the court, "was bought for a particular use, and the defendant knew plaintiff would not buy an inferior article. The sale of the hay, then, for this particular use, ordinarily implies a certainty that it is fit for this use." [2]

Jones & Co. were manufacturers of tobacco, and Gerst was a manufacturer of tobacco boxes. It is well known in the trade that boxes for packing tobacco in must be made of dry and seasoned wood, otherwise the tobacco will mould and become damaged. Gerst agreed to furnish Jones & Co. during the season of 1876 as many boxes as the latter would use in their business at a certain price, and under this agreement did supply a great many, into which Jones & Co. packed their tobacco and shipped it. But much of this moulded in consequence of the boxes being made of green timber. It was held that Gerst was liable on an implied warranty that the boxes should be fit for the purpose of packing tobacco. "The defendant," said the court, "in undertaking to furnish the boxes impliedly agreed that they should be reasonably fit for that purpose. Had the plaintiffs gone to the defendant's factory and themselves selected certain boxes such as they believed would answer their purposes, it is very clear the defendant would not be liable, however worthless the boxes might be, because the plaintiffs in that case must have relied on their own skill and judgment exclusively. But the plaintiffs made no selection; they left that to the defendant; they relied upon his skill and judgment as a manufacturer to furnish an article suited to the business in which they were engaged. * * * It is no answer to say that here the defendant was ignorant of the defect in the boxes, and that he used every proper precaution to guard against it. Neither the ignorance of the seller nor the exercise of care and diligence on his part can exempt him from liability, where there is a warranty, whether it be express or implied." [3]

So, where a contract was to "furnish a steam-boiler suitable to the engine," it was held that there was a warranty that it was suitable for the purpose named.[4]

§ 9. SAME—NO WARRANTY OF KNOWN AND DEFINED ARTICLE. The cases just cited are to be distinguished from those in which a known, described, and defined article is ordered, and the purchaser gets what he has ordered. Here there is no warranty that the goods will answer the particular purpose for

[1] Murray v. Smith, 4 Daly, 277.

[2] Beals v. Olmstead, 24 Vt. 114; and see French v. Vining, 102 Mass. 132.

[3] Gerst v. Jones, 32 Grat. 524.

[4] Street v. Chapman, 29 Ind. 142; and see Wilson v. Dunville, L. R. 4 Ir. Rep. 249; Robertson v. Amazon Tug Co. L. R. 7 Q. B. Div. 598; Smith v. Baker, 40 L. J. (N. S.) 261; Macfarlane v. Taylor, L. R. 1 Sc. App. 245; Snelgrove v. Bruce, 16 U. C. C. P. 561; Baker v. Lyman, 38 U. C. Q. B. 498; Bigelow v. Boxall, 38 U. C. Q. B. 452; Howard v. Hoey, 23 Wend. 350; Van Wycke v. Allen, 69 N. Y. 61; White v. Miller, 71 N. Y. 118; Hanger v. Evans, 38 Ark. 334; Wolcott v. Mount, 38 N. J. Law, 496; Taylor v. Cole, 111 Mass. 363; Merrill v. Nightingale, 39 Wis. 247; Robson v. Miller, 12 S. C. 586; Gerst v. Jones, 32 Grat. 518; Gammell v. Gunby, 52 Ga. 504; Wilcox v. Owens, 64 Ga. 601.

which they are purchased. The case of *Chanter* v. *Hopkins* [1] is probably the leading authority on this distinction. Here the defendant, a brewer, sent to the plaintiff, who was the inventor and manufacturer of a furnace known as "Chanter's Smoke-consuming Furnace," the following order: "Send me your patent hopper and apparatus to fit up my brewery copper with your smoke-consuming furnace." The plaintiff did so, the furnace was set up, but it turned out to be of no use for the purposes of a brewery. It was held that there was no implied warranty that it was suitable for such a purpose. "In the present case," said Lord ABINGER, "the question is whether or no the order has not been complied with in its terms. What is the order? It is an order for one of those engines of which the plaintiff was known to be the patentee. He was not obliged to know the object or use to which the defendant meant to apply it, and it is admitted there is no fraud. If, when the plaintiff received such an order, he had known it could not be so applied, and felt that the defendant was under some misapprehension on the subject, and that he was buying a thing on the supposition that he could apply it to that use, when the plaintiff very well knew he could not, in that case it might affect the contract on the ground of the suppression of a material fact. Or, if the terms of the contract were proposed by the plaintiff himself, such as, ' I will send you one of my smoke-consuming furnaces which will suit your brewery,' in such a case that would be a warranty that it would suit a brewery. But in this case no fraud whatever is suggested, and the case is that of an order for the purchase of a specific chattel which the buyer himself describes, believing, indeed, that it will answer a particular purpose to which he means to put it; but if it does not, he is not the less on that account bound to pay for it. The seller does not know it will not suit his purpose, and the contract is complied with in its terms. It appears to me that this is the ordinary case of a man who has had the misfortune to order a particular chattel on the supposition that it will answer a particular purpose, but he finds it will not." And PARKE, B., puts this illustration: "Suppose," says he, "a party offered to sell me a horse of such a description as would suit my carriage, he could not fix on me a liabilty to pay for it, unless it were a horse fit for the purpose it was wanted for; but if I describe it as a particular bay horse, in that case the contract is performed by his sending that horse; and it appears to me the present is a similar case. * * * The purchase is of a defined and well-known machine. The plaintiff has performed his part of the contract by sending that machine, and it is the defendant's concern whether it answers the purpose for which he wanted to use it or not. As I read the contract, all the plaintiff has to do is to send his patent machine, and whether it answers the purpose of the defendant or not, with that the plaintiff has nothing to do; he has furnished the machine contracted for, and he is entitled on that contract to recover the stipulated price."

In *Ollivant* v. *Bayley* [2] the plaintiff was the owner and manufacturer of a patent machine for printing in two colors. The defendant looked at the machine on the plaintiff's premises, and ordered one, plaintiff undertaking in writing to make him "a two-color printing machine on my patent principle." The machine was made and delivered, but the defendant refused to pay for it on the ground that it had been found useless for printing in two colors. The jury were told that if the machine described was a known, ascertained article ordered by the defendant he was liable, whether it answered his purpose or not; but that if it was not a known, ascertained article, and defendant had merely ordered and plaintiff agreed to supply a machine for printing two colors, the defendant was not liable unless it would do so. The plaintiff had a verdict, which was sustained on appeal, where, the defendant's counsel arguing that the contract was to be construed as requiring an instrument

[1] 4 Mees. & W. 399.    [2] 5 Q. B. 288.

which should be reasonably fit for printing in two colors, WIGHTMAN, J., answered: "You contend that if the principle is not really adapted to the purpose he must send something not according to the principle."

In *Port Carbon Iron Co.* v. *Groves*[1] the contract was for 10 tons of "A No. 1 pig-iron." The defendant purchased it for castings, but it turned out to be not at all the kind of iron for that purpose. · It was held that there was no warranty that the thing was fit for that purpose. "If a thing be ordered of the manufacturer for a special purpose," said the court, "and it be supplied and sold for that purpose, there is an implied warranty that it is fit for that purpose. This principle has been carried very far. It must, however, be limited to cases where a thing is ordered for a special purpose, and not applied to those where a special thing is ordered, although this be intended for a special purpose."

In another case the defendant sold the plaintiff 150 barrels of an article manufactured by him, called "Chappell's Fertilizer," to be used on his land. The stuff turned out to be of little use for fertilizing purposes, nevertheless it was held that no action would lie,—there was no warranty, because it was the sale of a specific, ascertained, and defined article. "If the plaintiff," said the court, "relying on the defendant's skill and judgment, had applied to him to furnish a manure which would produce the effect attributed to Chappell's fertilizer, without specifying what particular kind of manure he wanted, and the defendant had accordingly furnished an article which proved to be entirely worthless, there would be good ground for imputing an implied warranty."[2] Thus, where a person contracted at a price agreed to take all the wheat A. might raise on his farm, it was held that there was no implied warranty as to the quality of the wheat.[3]

§ 10. SAME—RULE THE SAME WHETHER VENDOR BE MANUFACTURER OR NOT. In *Brown* v. *Edgington*[4] the plaintiff sent to the defendant's shop—the defendant was a dealer in ropes—to purchase a crane rope, telling him it was wanted for the purpose of raising pipes of wine from a cellar. The defendant, not having a rope of the proper thickness, undertook to have one made, and sent his servant to the plaintiff's premises to take the measure, and afterwards to fix the rope. A short time afterwards, while some of the plaintiff's servants were hauling up a cask of wine, the rope broke, the barrel was stove in, and the wine lost. · It was held that there was an implied warranty that the rope should be fit for the purpose for which it was required, and the defendant was held liable; and that the rule was not limited· to cases where the vendor was also the manufacturer of the vehicle, but extended to all cases where the buyer relied upon the skill and judgment of the seller.[5]

§ 11. VENDOR'S SKILL NOT RELIED ON—NO WARRANTY. In the case of an implied warranty that an article is fit for the purpose for which it is intended, it is generally required, in order to raise such implied warranty, that the vendor's skill should be relied on by the purchaser. Therefore, the converse of this rule has been established, viz.: that when the skill of the vendor is not relied upon by the vendee, there is no implied warranty of fitness. *Dounce* v. *Dow*[6] is usually referred to as an authority on this principle, or better, perhaps, as an exception to the general rule. In this case the defendants ordered of the plaintiff, who was a dealer in iron, 10 tons of "XX pipe iron," to be used in the manufacture of castings for farming instruments, which required soft, tough iron. The plaintiff furnished the iron of the brand specified, but when used by defendants was found not to answer the purpose, being hard and brittle. It was held that the said warranty by plain-

[1] 68 Pa. St. 149.
[2] Mason v. Chappell, 15 Grat. 572.
[3] Davis v. Murphy, 14 Ind. 150; and see Shepherd v. Pybus, 4 Scott, N. R. 449.

[4] 2 Scott, N. R. 496.
[5] And see Bigge v. Parkinson, 7 H. & N. 955.
[6] 6 Thomp. & C. 653; 64 N. Y. 411.

tiff was that the iron was "XX pipe iron," and that there was no warranty that it was fit for the manufacture of farming implements, because the defendants had not relied on the plaintiff's judgment, but had considered for themselves that the iron in question was fit for the purpose. It would appear that this case might have been determined in the same way on another ground, viz., that the defendants had ordered a specific, defined article which the plaintiffs had furnished.[1]

§ 12. WARRANTY BY MANUFACTURER THAT ARTICLE IS FREE FROM LATENT DEFECT. It has been held in New York that the implied warranty that a manufactured article sold by the manufacturer is free from any latent defect is restricted to such defects as grow out of the process of manufacture, and do not extend to defects in the materials employed.[2] On the other hand, in Ohio a contrary doctrine has been announced. In *Rodgers* v. *Niles*,[3] N. & Co. agreed with R. & Co. to manufacture and deliver to the latter three steam-boilers to run their engines in their boiler-mills, for which R. & Co. agreed to pay a specified price. It was held to be an implied stipulation of the contract that the boilers should be free from all such defects of material and workmanship, whether latent or otherwise, as would render them unfit for the usual purposes of such boilers.[4]

§ 13. IMPLIED WARRANTY ON SALE OF PROVISIONS—THE ENGLISH RULE. Whether on the sale of provisions there is an implied warranty that the articles are fit for food, is a question upon which there is much difference of opinion, and on which the authorities are far from being harmonious. Blackstone says that it is a sound and elementary principle that in a contract for the sale of provisions it is implied that they are wholesome, and if they be not, an action on the case for deceit lies against the vendor.[5]

In *Burnby* v. *Bollett*[6] the question was examined in the most thorough manner by Baron PARKE, in the court of exchequer. A., a farmer, bought in the public market from B., a butcher, the carcass of a pig for domestic consumption, leaving at the stall till he could remove it. Afterwards, C., wanting a pig, bought A.'s from him. The pig was diseased and unfit for food, but none of them knew it, nor was there a warranty given by any one. The court held that there was no implied warranty that the pig was fit for food from A. to C. "On the part of the plaintiff," said PARKE, B., "the argument was that the sale of victuals to be used for man's consumption differed from the sale of other commodities, and that the vendor of such, without fraud, would be liable to the vendee on an implied warranty. This position is apparently laid down in Keilway, 91; but the authorities there referred to in the Year Books (9 Hen. VI. 53*b*, and 11 Edw. IV. 6*b*, and others,) when well considered, lead rather to the conclusion that there is no other difference between the sale of food for man and other articles than this, viz.: that victualers and common dealers in victuals are not merely in the situation of common dealers in other commodities, nor are they liable under the same circumstance as they are; as, if an order be sent to them to be executed, they are to be presumed to undertake the supply of food and wholesome meat, and they are likewise punishable as a common nuisance for selling corrupt meat, by virtue of an ancient statute; and this, certainly, if they knew the fact, and probably if they do not. Such persons are, therefore,

---

[1] Emmerton v. Matthews, 7 Hurl. & N. 586; Palmer's Appeal. 96 Pa. St. 106; Matthews v. Hartson, 3 Pittsb. 86; Robertson v. Amazon Tug Co. L. R. 7 Q. B. Div. 598.

[2] Hoe v. Sanborn, 21 N. Y. 552.

[3] 11 Ohio St. 48.

[4] Hoe v. Sanborn was distinguished

from this case on the ground that the latter was an executed sale, while the former was an executory contract.

[5] 3 Bl. Com. 166. This view is criticised by Benjamin in his work on Sales, (p. 875,) and defended by Chitty in his work on Contracts, (p. 419.)

[6] 16 Mees. & W. 644.

civilly responsible to those customers to whom they sell such victuals, for any special particular injury, by the breach of the law which is thereby committed. Lord COKE lays it down that all persons, as well as common dealers, are liable criminally for selling corrupt meat; for, by the statute 51 Hen. III., and by the statute made in the reign of Edw. I., it is ordained that none shall sell corrupt victuals, and the statute of 51 Hen. VII. says that the pillory and tumbril and assize of bread and ale applies only to vintners, brewers, butchers, and victualers. * * * It is said in the Year Book (9 Hen. VI. 53) that the warranty is not to the purpose, for it is ordained that none shall sell corrupt victuals; and in *Roswell* v. *Vaughan*,[1] where TANFIELD, C. B., and ALTHAM, B., say that 'if a man sells victuals which is corrupt, without warranty, an action lies because it is against the commonwealth.' This, also, explains the note of Lord HALE in 1 Fitz. Nat. Br. 94, that there is diversity between selling corrupt wines and merchandise, for then an action on the case does lie without warranty; otherwise, if it be for a taverner or victualer, if it prejudice any. The defendant in this case was not dealing in the way of a common trader, and was not punishable by indictment for what he did." This ruling was followed and approved in *Emmerton* v. *Matthews*[2] and *Smith* v. *Baker*,[3] from which cases it is clear that the English rule is that (at common law) there is no implied warranty that provisions sold are sound or fit for food.

§ 14. SAME—THE RULE IN THE UNITED STATES. The weight of authority in the United States seems to establish a rule similar to that of the English courts. A qualification, however, not made in the older country finds support in several of the states. In the early case of *Bailey* v. *Nichols*,[4] decided in Connecticut in 1796, it was laid down that "the defendant, by selling his beef for cargo beef, and asking and receiving a sound price for it, did warrant it to be such as the law prescribed under the denomination of cargo beef, and that it was good and sound." It will be observed, however, that this case went on the doctrine of a sound price guarantying a sound article,—a doctrine subsequently overruled by the same court.[5] In *Emerson* v. *Brigham*,[6] a leading case on this point, SEWALL, J., said:

"Now there are cases in which a representation willfully false is to be presumed from the circumstances of the transaction and of the parties, when it is not required to be otherwise or directly proved. In this way, perhaps, what was cited from Blackstone's Commentaries, and relied on for the plaintiff in the argument of the case at bar, may be reconciled with the general doctrine as I have stated it; and so, likewise, many decisions which seem at first sight to indicate another rule, will be found within the general doctrine exemplified by Justice POPHAM; at least, in the intended application of it. Justice BLACK-

---

[1] Cro. Jac. 196.

[2] 7 Hurl. & N. 586.

[3] 40 Law T. (N. S.) 261.

[4] 2 Root, 407.

[5] In Dean v. Mason, 4 Conn. 428, (1822.) In this case it was said: "The implied warranty contended for is founded on the presumed fact that an adequate price was given for the skins, admitting them to be good, and on the inference that this amounts to a warranty of the articles sold as being sound and merchantable. * * * The notion that a high or sound price is tantamount to a warranty has been long exploded. In Parkinson v. Lee, 2 East, 314, it was adjudged that no warranty was implied from the fullness of the consideration; and that if the seller sells the thing as he believes it to be, without fraud, the

law will not imply that he sold it on any other terms than those expressed. And it is an established rule that in order to enable a vendee to maintain an action against the vendor, there must be either fraud or an express warranty. Holden v. Dakin, 4 Johns. 421; Sands v. Taylor, 5 Johns. 395; Thompson v. Ashton, 14 Johns. 316; Chapman v. Murch, 19 Johns. 290; Sweet v. Colgate, 20 Johns. 196. The vexations and expensive litigation which might often arise on the doctrine of a warranty implied from the soundness of the price are prevented by the adoption of a certain rule which can never operate unjustly, as by the buyer an express warranty may always be demanded."

[6] 10 Mass. 197.

STONE (3 Bl. Comm. 164, 165) has classed the cases of deceit and breaches of express warranties in contracts for sales under the head of implied contracts. He says it is constantly understood that the seller undertakes that the commodity he sells is his own, and in contracts for provisions it is always implied that they are wholesome; and in a sale with warranty the law annexes a tacit contract that if the article be not as warranted, compensation shall be made to the buyer; and if the vendor knows his goods to be unsound, and hath used any art to disguise them, or if they be in any shape different from what he represents them to be to the buyer, this artifice shall be equivalent to an express warranty, and the vendor is answerable for their goodness. It is obvious that in this very general classification, the details and examples are imperfectly introduced, and with some inaccuracy. It is not implied in every sale of provisions that they are wholesome, any more than it is in sales of other articles, where proof of a distinct affirmation seems, in Justice BLACKSTONE'S opinion, to be requisite. The contrary may be, and often is, understood between the parties; and it is only when the false representation to be proved in the one case may be presumed or taken to be proved in the other, that the rule of law applies, and the remedy, as in a case of deceit, is allowed. An artifice must be proved to entitle the suffering party to the remedy, equivalent to a remedy upon an express warranty, as well in the case of provisions as in any other case. The difference is that in the case of provisions the artifice is proved when a victualer sells meat as fresh to his customers at a sound price, which, at the time, was stale and defective, or unwholesome from the state in which the animal died. For, in the nature of the bargain, the very offer to sell is a representation or affirmation of the soundness of the article, when nothing to the contrary is expressly stated; and his knowledge of the falsehood in this representation is also to be presumed from the nature and duties of his calling and trade. But cases may be supposed where, this presumption being repelled by contrary evidence, the seller would not be liable; as where a different representation is made, and this is proved directly, or is necessarily to be presumed from the nature of the article, the state of the market, or other circumstances. Indeed, there is nothing to be inferred in a sale of provisions which may not be inferred to a like purpose in other cases, when the calling or profession of the seller, the soundness of the price, and the nature of the article sold have been made the grounds of decision. There is an especial and invariable presumption as to the property of the vendor when the article sold was in his possession; and hence the distinction when the article is not in his possession. And upon the whole it will be found, I believe, in every instance that the action as for a deceit has been maintained in those cases only where an affirmation or representation willfully false, or some artifice, has been proved, or has been taken to be proved, either directly or because it was necessarily to be presumed from the circumstances and nature of the bargain, and the situation of the parties.

"It is admitted in the case at bar that in a bargain between these parties there was no direct affirmation of the soundness of the article. Perhaps, however, a representation to this effect is necessarily to be implied from the nature of the bargain, it being in the common course of dealing, and for a sound price, and for an article which, to be of any value, must be understood to be sound. This much, at least, may be safely presumed as the understanding between these parties: that as to the kind, the quality, the state, and quantity of the meat contained in the barrels sold by the one and purchased by the other as barrels of merchantable beef, the seller undertook to have full faith in the brand of the deputy inspector, a public officer employed and intrusted to ascertain these facts. The seller must be understood to represent that, for aught he had known to the contrary, the brand appearing on the barrels had been truthfully and faithfully applied, and that no alteration or change of the article had happened within his knowledge. Now, is there any

evidence or any circumstance in this transaction from which it may be inferred that in affirmation to this effect the sellers would have been willfully false, or that, in an express representation, such as I have supposed to be implied in this case, they would have been guilty of an artifice? They would have been chargeable to that extent, if at the time of the sale they had any knowledge of the bad state of the barrels, such as it proved to be, or had any special reason to suspect that the beef in them had not been properly cured, was without sufficient salt, was already in a putrid state, or becoming putrid, or, in short, if they then knew, or actually suspected, that in this instance the inspector had been false, ignorant, or depraved. With evidence to that effect this case would be within the rule, and the plaintiffs entitled to this remedy for the deception which they had undoubtedy suffered, and from which a loss and damage had ensued. But on this point the evidence fails. Indeed, it is admitted that the defendants had no knowledge at the time of the sale of the unsuitable quality and state of the beef, or of the barrels containing it, or that it had not been packed as the law requires. In this state of the evidence and of the case, the result is in favor of the defendants. Against them the plaintiffs have no remedy for the loss and damage sustained by a deception which has not happened or been effected by any false representation or artifice chargeable to the defendants; and they took upon them no extraordinary risk in this particular by any warranty accompanying the sale."[1]

In *Moses* v. *Mead*,[2] BRONSON, C. J., in reviewing the cases on the point, said: "We are referred to the authority of Blackstone for another exception to the general rule, and it is insisted that, on a sale of provisions, there is an implied warranty that they are wholesome. * * * The language of the commentator leaves it somewhat doubtful whether his mind was not upon a deceit in the sale, which stands on a different footing from a warranty. If he intended to affirm that the law implies a warranty of soundness in the sale of provisions, the remark is without any support in the English adjudications. The *dictum* of Blackstone has been directly overruled in Massachusetts.[3] The doctrine of Blackstone, with a very important qualification, was affirmed by the judge who prepared the opinion in *Van Bracklin* v. *Fonda;*[4] but that was plainly a case of fraud. The jury found that the beef was unsound and unwholesome, and that the defendant—the seller—knew the animal to be diseased. The case of *Hart* v *Wright*[5] arose on a sale of provisions, and one member of the court of errors was for implying a warranty of soundness; but that doctrine did not prevail.

In *Humphreys* v. *Comline*[6] two barrels of molasses were sold to a retail grocer. The purchaser did not examine it, at the time he purchased it, beyond looking at the outside of the barrels. The molasses when drawn was found to be unfit for consumption. In an action for the purchase price, it was held that there was no implied warranty that the molasses was fit for the purpose of food. "It is said," the court remarked, "that, in the sale of provisions for domestic use, a warranty is implied that they are sound and wholesome, on the ground that such a warranty is necessary for the preservation of health and life. But it has been denied that anything can be inferred from the sale of provisions which may not be inferred to a like purpose in other cases.[7] In the last two cases, the warranty is put upon the ground of the deceit, and it is said the only difference is that, in the case of provisions, the fraud is more obvious; as, where a butcher sells stale and unwholesome meat

---

[1] And see Hart v. Wright, 17 Wend. 367; Winsor v. Lombard, 18 Pick. 61; Howard v. Emerson, 10 Mass. 320; Goad v. Johnson, 21 Minn. 70; Goldrich v. Ryan, 3 E. D. Smith, 324.

[2] 1 Denio, 378.

[3] Emerson v. Brigham, 10 Mass, 197.

[4] 12 Johns. 468.

[5] 17 Wend. 267; 18 Wend. 449.

[6] 8 Blackf. 516.

[7] Wright v. Hart, 18 Wend. 464; Emerson v. Brigham, 10 Mass. 197; Winsor v. Lombard, 18 Pick. 57.

to his customers as fresh and sound, the artifice is proved by the fact itself, as his knowledge of the falsehood is to be presumed from the nature and duties of his trade or calling. Without deciding that point, however, or whether molasses, or such like articles, should be included under the term 'provisions,' if the rule that, by the sale of provisions, without any fraud on the part of the vendor, a warranty is implied, be well founded, we think that this case does not come within such rule, inasmuch as the molasses in question was not sold for immediate domestic consumption, but as merchandise, to a dealer, to be sold again at retail. To say that, in such cases, all articles which may be used in the diet of the human family are subject to a rule of law, as regards their sale, different from that which prevails in relation to other merchandise, would be to establish a distinction which might prove extremely inconvenient and troublesome in commercial transactions, and one not warranted by any analogous decisions."[1]

§ 15. SAME—SALE DIRECT TO CONSUMER. The qualification noted above as being found in some of the American decisions, relates to the case of an article of food sold to a consumer for immediate use, as distinguished from the sale by a manufacturer or raiser to a dealer, or by a dealer to another dealer.

Thus, in *Bracklin* v. *Fonda*,[2] it was said: "In the sale of provisions for domestic use, the vendor is bound to know that they are sound and wholesome, at his peril."

In *Howard* v. *Emerson*,[3] where a cow had been sold to a retail dealer in meats, MARTIN, J., said: "We think that this exception, if established, does not extend beyond the case of a dealer who sells provisions directly to the consumer for domestic use. In such cases it may be reasonable to infer a tacit understanding which enters into the contract that the provisions are sound. The relation of the buyer to the seller, and the circumstances of the sale, may raise the presumption that the seller impliedly represents them to be sound. But the same reasons are not applicable to the case of one dealer selling to another dealer." In *Moses* v. *Mead*,[4] BRONSON, C. J., said: "Although the doctrine of Blackstone cannot be supported in its whole extent, I am not disposed to deny that, on a sale of provisions for immediate consumption, the vendor may be held responsible in some form for the sound and wholesome condition of the article which he sells."

In *Hoover* v. *Peters*,[5] to a suit for a balance of the price of the carcasses of three hogs sold by the plaintiff to the defendants, to be used by them as food in their lumber camp, the latter set up that one of the carcasses was unsound, and unfit for use. It was proved that the plaintiff knew the purpose for which the defendant purchased them. On the trial the defendant asked the court to charge that there was an implied warranty that the pork was sound and fit for food, which was refused. On appeal this was held error, and the judgment for plaintiff was reversed. "It seems to be settled by many authorities," said CAMPBELL, J., "that no implied warranty of soundness arises where such articles are purchased by a dealer to sell again. Whether this rule arises from the fact that any injury from the use of the articles is likely to be remote, and not readily traced out, or because, where his purpose in buying is merely speculative, one commodity is not to be distinguished from another in its incidents as merchandise, or what special reasons have led to it, cannot easily be determined. It stands as a recognized doctrine, whatever may have been its reasons. But where property is bought for a particular purpose, and only because of its supposed fitness for that, there are

[1] But see, apparently contra, Osgood v. Lewis, 2 Har. & G. (Md.) 495; Burch v. Spencer, 22 N. Y. S. C. 504.
[2] 12 Johns. 268.
[3] 10 Mass. 320.
[4] 1 Denio, 378.
[5] 18 Mich. 51.

many cases in which a warranty is implied, unless the purchaser has seen fit to act upon his own responsibility and judgment. And where articles of food are bought for consumption, and the vendor sells them for that express purpose, the consequences of unsoundness are so dangerous to health and life, and the failure of consideration is so complete, that we think the rule that has often been recognized, that such sales are warranted, is not only reasonable, but essential to public safety. There may be sellers who are not much skilled, and there may be purchasers able to judge for themselves; but in sales of provisions the seller is, generally, so much better able than the buyer to judge of quality and condition, that, if a general rule is to be adopted, it is safer to hold the vendor to a stricter accountability than to throw the risk upon the purchaser. The reason given by the New York authorities in favor of health and personal safety, is much more satisfactory than the purely commercial considerations, which take no account of these important interests. While the question has not, perhaps, been very often decided, the principle has been generally accepted among the legal writers, and we feel no disposition to recede from it. We have been pointed to no distinction between sales in one market or another, and can conceive of no special reason for regarding one sale for this purpose as differing in its incidents from any other. The doctrine seems to be that any purchase for domestic consumption is protected."

In *McNaughton* v. *Joy*,[1] it was held by a Philadelphia court that, on a sale of butter and potatoes for table use, there was an implied warranty that they were fit for such purpose.[2]

§ 16. SALE OF GOODS BY SAMPLE—THE GENERAL RULE. It is laid down in a large number of cases, and may be considered as well-settled law, that on the sale of goods by sample there is an implied warranty that the goods sold shall be equal in quality as well as of the same kind as the sample produced.[3] In Pennsylvania, however, the later cases hold that on such a sale the warranty is only that the goods shall be of the same kind or species; that there is no warranty that they shall be of the same grade or quality.[4]

§ 17. SAME—NO WARRANTY OF MERCHANTABILITY. On a sale by sample, however, there is no implied warranty of merchantability, "for the seller, by exhibiting the sample and impliedly agreeing to bind himself that the bulk of the goods sold shall be equal to the sample, is thus supposed to relieve himself from all other liability in the matter, and therefore to exclude from the contract the implied stipulation of merchantability, on the principle of *expressum facit cessare tacitum.*"[5]

§ 18. EXCEPTION—WHERE SAMPLE DOES NOT SHOW QUALITY. An exception to the foregoing rule exists where the quality cannot be judged of from the sample. A firm of manufacturers of shirting contracted to supply the plaintiff with a quantity of gray shirting according to sample, each piece to weigh seven pounds. The goods were delivered, and were of the right weight, but it was afterwards found that the weight was made up by introducing into the fabric a percentage of clay which made the goods unmerchantable.

[1] 1 Wkly. Notes Cas. 470.

[2] Ryder v. Neitge, 6 Heisk. 340; Hyland v. Sherman, 2 E. D. Smith, 234; Humphreys v. Comline, 8 Blackf. 516; Benj. Sales, 665.

[3] Parkinson v. Lee, 2 East, 314; Parker v. Palmer. 4 Barn. & Ald. 387; Barnard v. Kellogg, 10 Wall. 383; Leonard v. Fowler, 44 N. Y. 289; Hargous v. Stone, 1 Seld. 73; Bradford v. Manly,13 Mass. 139; Graff v. Foster, 67 Mo. 512; Gunther v. Atwell, 19 Md. 157; Gill v. Kaufman, 16 Kan. 571;

Hubbard v. George, 49 Ill. 575; Merriman v. Chapman, 32 Conn. 146; Brantley v. Thomas, 22 Tex. 271; Boothvy v. Plaisted, 51 N. H. 436; Borrekins v. Bevens, 3 Rawle, 37; Moore v. McKinley, 5 Cal. 471; Getty v. Rountree, 2 Chand. 28.

[4] Fraley v. Bispham, 10 Pa. St. 320; Boyd v. Wilson, 83 Pa. St. 319.

[5] Biddle, War. ? 159; Parkinson v. Lee, 2 East, 314; Randall v. Newson, L. R. 2 Q. B. Div. 102; Sands v. Taylor, 5 Johns. 404.

The presence of the clay could not be discovered in the sample. It was held that the sale by sample excluded the implied warranty of merchantability only as to such matters as could be judged of from the sample.[1]

§ 19. EXHIBITION OF SAMPLES DOES NOT RENDER SALE ONE BY SAMPLE. And it is held that a mere production of a sample does not make the transaction a sale by sample, so as to raise an implied warranty that the goods in bulk are equal in all respects to the sample exhibited.

In *Barnard* v. *Kellogg*,[2] a leading though recent authority, a wool dealer in Boston sent to a dealer in wool in Hartford samples of foreign wool in bales, which he had for sale on commission, with the prices, and the latter offered to purchase the different lots at the prices, if equal to the samples furnished. The wool broker accepted the offer, provided the wool dealer at Hartford would come to Boston and examine the wool on a day named, and then report if he would take it. The wool dealer went to Boston, and after examining certain of the bales as fully as he desired, and being offered an opportunity to examine all the remaining bales, and to have them open for his inspection, which offer he declined, purchased. The wool proved, unknown to the vendor, to have been deceitfully packed, rotten and damaged wool and tags being concealed by an outer covering of fleeces in their ordinary state. The supreme court of the United States held that this was not a sale by sample, and that there was no implied warranty of quality, or that the goods were equal to the sample produced. "One of the main reasons," said Mr. Justice DAVIS, "why the rule does not apply in a case of a sale by sample, is because there is no opportunity for a personal examination of the bulk of the commodity which the sample is shown to represent." In this case it was clear that the purchaser had full opportunity to examine the goods, but was satisfied to dispense with it. Again, where the defendants wrote plaintiffs a letter saying that "advices received from Trieste this morning by an English packet quote first quality of Ferrara hemp same as sold to you," and the hemp had been represented as of first quality, but the plaintiffs here examined it by cutting open one bale, and might have examined all if they had desired, it was held that this was not a sale by sample. "The plaintiff," said BRONSON, J., "was told to examine, and did examine, the hemp for himself. He inspected the bales, cut open one of them, and was at liberty to open others, had he chosen to do so. If he was not satisfied of the quality and condition of the goods, he should either have proceeded to a further examination, or provided against a possible loss by requiring a warranty."[3]

In *Beirne* v. *Dodd*[4] the defendant sold the plaintiff, in his shop, a number of blankets in bales, exhibiting at the time to the plaintiff several pairs of the blankets, which the latter examined and found sound. The rest were not examined, though they might have been. On delivery they were found to be moth-eaten. "The mere circumstance," said JEWETT, J., "that the seller exhibits a sample at the time of the sale will not of itself make it a sale by sample, so as to subject the seller to liability on an implied warranty as to the nature and quality of the goods; because it may be exhibited, not as a warranty that the bulk corresponds to it, but merely to enable the purchaser to form a judgment as to its kind and quality. If the contract be connected, by the circumstances attending the sale, with the sample, and refer to it, and it be exhibited as the inducement to the contract, it may be a sale by sample; and then the consequence follows that the seller warrants the bulk of the goods to correspond with the specimen exhibited as a sample. Whether a sale be a sale by sample or not, is a question of fact to find from the evidence

---

[1] Moody v. Gregson, L. R. 4 Exch. 49; Gardiner v. Grey, 4 Camp. 114; Boyd v. Wilson, 83 Pa. St. 325; Heilbut v. Hickson, L. R. 7 C. P. 438.

[2] 10 Wall. 38.
[3] Sailsbury v. Stainer, 19 Wend. 159.
[4] 5 N. Y. 95.

in each case; and, to authorize a jury to find such a contract, the evidence must satisfactorily show that the parties contracted solely in reference to the sample exhibited; that they mutually understood that they were dealing with the sample as an agreement or understanding that the bulk of the commodity corresponded with it; or, in other words, the evidence must be such as to authorize the jury, under all the circumstances of the case, to find that the sale was intended by the parties as a sale by sample. * * * That a personal examination of the bulk of the goods by the purchaser at the time of the sale is not practicable nor convenient, furnishes no sufficient ground, of itself, to say that the sale is by sample." The want of an opportunity, from whatever cause, for such an examination, is doubtless a strong fact in reference to the question of the character of the sale, whether it is made by sample or not; but it is, nevertheless, true that a contract of sale by sample may be made, whether such examination be practicable or not, if the parties so agree. Where the acts and declarations of the parties in making the contract for the sale of goods are of doubtful construction, evidence that it was impracticable or inconvenient to examine the bulk of the goods would be proper, and, in connection with evidence of other circumstances attending the transaction, might aid in coming to a correct conclusion in respect to the true character of the contract." [1]

§ 20. IMPLIED WARRANTY OF TITLE—THE RULE IN ENGLAND. "It is very remarkable," said PARKE, B., in *Morley* v. *Attenborough*,[2] "that there should be any doubt on this subject, it being certainly a question so likely to be of common occurrence, especially in this commercial country. Such a point one would have thought would not have admitted of any doubt. The bargain and sale of a specified chattel by our law, which differs in that respect from the civil law, undoubtedly transfers all the property the vendor has, where nothing further remains to be done, according to the intent of the parties. But it is made a question whether there is annexed by law to such a contract, which operates as a conveyance of the property, an implied agreement on the part of the vendor that he has the ability to convey." Mr. Baron PARKE, as a result of the consideration of all the cases held, "that there is by the law of England no warranty of title in the actual contract of sale, any more than there is of quality. The rule of *caveat emptor* applies to both."

*Morley* v. *Attenborough* was the case of the sale of an unredeemed pledge by a pawnbroker, and it was held that there was no implied warranty of title. A few years later the case of *Eicholz* v. *Bannister*[3] was decided by the common pleas. Here the plaintiff purchased at the defendant's warehouse certain goods described as "a job just received by him." After the goods were delivered and paid for, it turned out that they had been stolen, and the purchaser was compelled to give them up to the true owner. He then brought an action for the purchase money paid by him, and it was held that he ought to recover.

It will thus be seen that the law in England on this subject is not very clear.

But Mr. Benjamin, in his work on Sales,[4] says: "On the whole, it is submitted that since the decision in *Eicholz* v. *Bannister* the rule is substantially altered. The exception here became the rule, and the old rule has dwindled

---

[1] Gardiner v. Grey, 4 Camp. 144; Powell v. Horton, 2 Bing. N. C. 668; Tye v. Fynemore, 3 Camp. 462; Carter v. Crick, 4 Hurl. & N. 412; Towerson v. Aspatna, 27 Law T. (N. S.) 276; Russell v. Nicolofulo, 8 C. B. (N. S.) 362; Josling v. Kingsford, 13 C. B. (N. S.) 447; Megaw v. Malloy, L. R. 2 Ir. 530; Waring v. Mason, 18 Wend. 425; Ames v. Jones, 77 N. Y. 614; Atwater v. Clancy, 107 Mass. 369; Schuitz v. Oriental Print Works, 114 Mass. 123; Whitmore v. South Boston Iron Co. 2 Allen, 52; Jones v. Wasson, 3 Baxt. 211; Day v. Raguet, 14 Minn. 273, (Gil. 203.)

[2] 3 Exch. 509.

[3] 17 C. B. (N. S.) 708.

[4] Page 839.

into the exception, by reason, as Lord CAMPBELL said, of having been well-nigh eaten away. The rule at present would seem to be stated more in accord with the recent decisions, if put in terms like the following: A sale of personal chattels implies an affirmation by the vendor that the chattel is his, and therefore he warrants the title, unless it be shown by the facts and circumstances of the sale that the vendor did not intend to assert ownership, but only to transfer such interest as he might have in the chattels sold." [1]

§ 21. IMPLIED WARRANTY OF TITLE—THE AMERICAN RULE. In the United States there is no such confusion or uncertainty in the decisions; but the implied warranty of title is well established. "It may now be regarded as well settled," says SHARSWOOD, J., "that a person selling as his own personal property of which he is in possession, warrants the title to the thing sold; and that if, by reason of a defect of title, nothing passes, the purchaser may recover back his money, though there be no fraud or warranty on the part of the vendor." [2]

§ 22. NECESSARY DEPRECIATION—NO IMPLIED WARRANTY. There is no implied warranty against a necessary and likely depreciation which may take place in the quality of the goods between the time of the sale and the delivery into the hands of the purchaser. Thus, when ale was sold in Chicago to a party in Montana, it was held that there was no warranty that it would bear transportation to Montana. [3] So, where a sale of wheat was made by sample, the court said: "There is no pretense that there was any difference between the sample and the cargo, except that the latter was treated in a manner incident to every cargo of southern wheat. This deterioration of the cargo, and which undoubtedly prevented its malting, was a fact against which the exhibition of the sample did not warrant, and it is a fact with which the defendants (purchasers) must be presumed to be acquainted; for the law will presume every dealer in articles brought to market acquainted with all the circumstances usually attendant on cargoes composed of these articles."

§ 23. WARRANTY IMPLIED FROM CUSTOM OF TRADE. In the early English case of *Jones* v. *Bowden*, [4] it was proved that on auction sales of drugs it was the custom to state in the catalogue whether the goods were sea-damaged or not. The defendants had offered for sale at auction a quantity of

[1] And see Brown v. Cockburn, 37 U. C. Q. B. 592; Johnston v. Barker, 20 U. C. C. P. 220; Mercer v. Cosman, 2 Hann. (N. B.) 240; Somers v. O'Donoghue, 9 U. C. C. P. 210.

[2] People's Bank v. Kurtz, 11 W. N. 225; 2 Kent, Comm. 478; Story, Sales, § 367; Ricks v. Delahunty, 8 Port. 137; Williamson v. Sammons, 34 Ala. 691; Hoe v. Sanborn, 21 N. Y. 555; McKnight v. Devlin, 52 N. Y. 401; McCoy v. Artcher, 3 Barb. 323; Dresser v. Ainsworth, 9 Barb. 619; Vibbard v. Johnson, 19 Johns. 77; Hermance v. Vernoy, 6 Johns. 5; Sweet v. Colgate, 20 Johns. 196; Baker v. Arnot, 67 N. Y. 448; Whitney v. Heywood, 6 Cush. 82; Hubbard v. Bliss, 12 Allen, 590; Shattuck v. Green, 104 Mass. 45; Cushing v. Breed, 14 Allen, 376; Emerson v. Brigham, 10 Mass. 202; Coolidge v. Brigham, 1 Metc. 551; Grose v. Hennessy, 13 Allen, 390; Door v. Fisher, 1 Cush. 273; Fogg v. Wilcutt, 1 Cush. 300; Bennett v. Bartlett, 6 Cush. 225; McCabe v. Morehead, 1 Watts & S. 513; Moser v. Hoch, 3 Pa. St. 230; Boyd v. Bobst, 2 Dall. 91;

Whitaker v. Eastwick, 75 Pa. St. 229; Porter v. Bright, 82 Pa. St. 443; Ritchie v. Summers, 3 Yeates, 531; Chamley v. Dulles, 8 Watts & S. 361; Swaizey v. Parker, 50 Pa. St. 450; Flynn v. Allen, 57 Pa. St. 482; Lyons v. Devilbis, 22 Pa. St. 185; Wood v. Sheldon, 42 N. J. Law, 421; Byrnside v. Burdett, 15 W. Va. 702; Mockbee v. Gardner, 2 Har. & G. 176; Osgood v. Lewis, Id. 495; Chisin v. Woods, Hardin, 531; Chancellor v. Wiggins, 4 B. Mon. 201; Marshall v. Duke, 51 Ind. 62; Long v. Anderson, 62 Ind. 537; Morris v. Thompson, 85 Ill. 16; Gookin v. Graham, 5 Humph. 480; Wood v. Cavin, 1 Head, 506; Calcock v. Goode, 3 Me. 513; Hale v. Smith, 6 Me. 420; Butler v. Tufts, 13 Me. 302; Gaylor v. Copes, 16 Fed Rep. 49; Storm v. Smith, 43 Miss. 497; Lewis v. Smith, 4 Fla. 47; Inge v. Bond, 3 Hawks, 101; Thurston v. Spratt, 52 Me. 202; Long v. Hickbottom, 28 Miss. 772; Huntington v. Hall, 36 Me. 501; Matheney v. Mason, 73 Mo. 677; Gross v. Kierski, 41 Cal. 114.

[3] Leggatt v. Sands, 60 Ill. 158.

[4] 4 Taunt. 847.

pimento, without saying anything about its condition, and it was purchased by the plaintiffs. It was held that there arose from this custom an implied warranty that the pimento in this case was not sea-damaged, "since it is usual," said MANSFIELD, C. J., "to mention the fact, if ·pimento is sea-damaged; when this is not mentioned as such, how would any one understand the catalogue, having simply the word 'pimento,' but not particularized as sea-damaged?" HEATH, J., concurred, and mentioned a trial before himself, and a *nisi prius* decision of his that where sheep were sold as stock, there was an implied warranty that they were sound; proof having been given that such was the custom of the trade.

In several cases in the courts of the United States, usage has been held sufficient to supply a warranty which otherwise would not have been implied.[1] But in by far the larger number of American adjudications on this subject usages of this character have been rejected, on the ground that they were intended to defeat the operation of a rule of law, and were therefore inadmissible.[2]            JOHN D. LAWSON.

*St. Louis, Mo.*

[1] Fatman v. Thompson, 2 Disn. 482; Gunther v. Atwell, 19 Md. 157; Sumner v. Tyson, 20 N. H. 384.

[2] Barnard v. Kellogg, 10 Wall. 383; Mixer v. Coburn, 11 Metc. 557; Casco Manuf'g Co. v. Dixon, 3 Cush. 407; People's Bank v. Bogert, 16 Hun, 270; Dodd v. Farlow, 11 Allen, 426; Thompson v. Ashton, 13 Johns. 416; 14 Johns. 316; Boardman v. Spooner, 13 Allen, 353; Baird v. Mathews, 6 Dana, 129; Wetherell v. Neilson, 20 Pa. St. 448, (overruling Snowden v. Warner, 3 Rawle, 101;) Coxe v. Heisley, 19 Pa. St. 243; Beckwith v. Farnum, 5 R. I. 230; Dickinson v. Gay, 7 Allen, 29; Beirne v. Todd, 3 Sandf. 89; 5 N. Y. 73; Whitmore v. South Boston R. Co. 2 Allen, 52.